Ricky WYATT, by and through his aunt and legal guardian, Mrs. W. C. Rawlins, Jr., et al., for themselves jointly and severally and for all others similarly situated, Plaintiffs,

v.

Dr. Stonewall B. STICKNEY, as Commissioner of Mental Health and the State of Alabama Mental Health Officer, et al., Defendants,

United States of America et al., Amici Curiae.

Civ. A. No. 3195–N.

United States District Court, M. D. Alabama, N. D.

April 13, 1972.

Attorneys' Fees Taxed June 2, 1972.

See also D.C., 344 F.Supp. 373.

George W. Dean, Jr., Destin, Fla., Jack Drake (Drake, Knowles & Still), Tuscaloosa, Ala., Reber F. Boult, Jr., Atlanta, Ga., Morton Birnbaum, Brooklyn, N. Y., for plaintiffs.

William J. Baxley, Atty. Gen. of Alabama, J. Jerry Wood, Asst. Atty. Gen. of Alabama, Montgomery, Ala., John J. Coleman, Special Asst. Atty. Gen. of Alabama, Birmingham, Ala., for defendants.

Ira DeMent, U. S. Atty., Middle District of Alabama, Montgomery, Ala., Robert H. Johnson and David J. W. Vanderhoof, Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., Cleveland Thornton, Special Asst. U. S. Atty., Middle District of Alabama, Montgomery, Ala., for United States amici curiae.

Charles R. Halpern (Center for Law & Social Policy), James F. Fitzpatrick, Stephen M. Sacks, and Jeffrey D.

Bauman (Arnold & Porter), Washington, D. C., Bruce Ennis (American Civil Liberties Union), New York City, Stanley Herr (NLADA National Law Office), Washington, D. C., Shelley Mercer (National Health and Environmental Program, School of Law, UCLA), Los Angeles, Cal., Paul Friedman (Center for Law and Social Policy), Washington, D. C., for other amici curiae.

## ORDER AND DECREE

JOHNSON, Chief Judge.

This litigation originally pertained only to Alabama's mentally ill,[1] but by motion to amend granted August 12, 1971, plaintiffs have expanded their class to include residents of Partlow State School and Hospital, a public institution located in Tuscaloosa, Alabama, designed to habilitate the mentally retarded.[2] In their amended complaint, plaintiffs have alleged that Partlow is being operated in a constitutionally impermissible fashion and that, as a result, its residents are denied the right to adequate habilitation. Relying on these allegations, plaintiffs have asked that the Court promulgate and order the implementation at Partlow of minimum medical and constitutional standards appropriate for the functioning of such an institution. Plaintiffs have asked also that the Court appoint a master and a professional advisory committee to oversee the implementation of judicially ordered guidelines and appoint a human rights committee to safeguard the personal rights and dignity of the residents. Finally plaintiffs have requested the Court to grant various forms of relief intended to ameliorate the financial difficulties certain to arise in connection with the upgrading of Alabama's public mental health institutions.[3]

1. On March 12, 1971, in a formal opinion and decree, this Court held that patients involuntarily committed to Bryce Hospital because of mental illness were being deprived of the constitutional right, which they unquestionably possess, "to receive such individual treatment as [would] give each of them a realistic opportunity to be cured or to improve his or her mental condition." Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala.1971). On August 12, 1971, the Court granted plaintiffs' motion to add to the lawsuit patients confined at Searcy Hospital, Mount Vernon, Alabama, another institution which, although designed to treat the mentally ill, failed to do so in accordance with constitutional standards. The Court, having unavailingly afforded defendants an opportunity to promulgate and effectuate minimum standards for adequate treatment of the mentally ill, determined on December 10, 1971, that such standards had to be judicially formulated and ordered implemented. Wyatt v. Stickney, 334 F.Supp. 1341 (M.D.Ala.1971). To that end, the Court conducted a hearing on February 3-4, 1972, at which the parties and amici submitted proposed standards for constitutionally adequate treatment, and presented expert testimony in support of the proposals. The aspect of the case relating to the Bryce-Searcy facilities will be considered by the Court in a decree separate from the present one.

2. As expressed by amici in their briefs and substantiated by the evidence in this case, *mental retardation* refers generally to subaverage intellectual functioning which is associated with impairment in adaptive behavior. This definitional approach to mental retardation is based upon dual criteria: reduced intellectual functioning and impairment in adaptation to the requirements of social living. The evidence presented reflects scientific advances in understanding the developmental processes of the mental retardate. The historic view of mental retardation as an immutable defect of intelligence has been supplanted by the recognition that a person may be mentally retarded at one age level and not at another; that he may change status as a result of changes in the level of his intellectual functioning; or that he may move from retarded to nonretarded as a result of a training program which has increased his level of adaptive behavior to a point where his behavior is no longer of concern to society. See United States President's Panel on Mental Retardation, Report of the Task Force on Law, 1963. (Judge David L. Bazelon, Chairman.)

3. More specifically, in a motion filed September 1, 1971, and renewed March 15, 1972, plaintiffs have asked that they be permitted to join various state officials as defendants in this case. Plaintiffs

On February 28–29, 1972, the Court conducted a hearing on the issues formulated by the pleadings in this case. Evidence was taken on the adequacy of conditions currently existing at Partlow as well as on the standards requisite for a constitutionally acceptable minimum habilitation program. The parties and amici [4] stipulated to a broad array of these standards and proposed additional ones for the Court's evaluation. The case now is submitted upon the pleadings, the evidence, the stipulations, and the proposed standards and briefs of the parties.

■ Initially, this Court has considered plaintiffs' position, not actively contested by defendants, that people involuntarily committed [5] through non-criminal procedures to institutions for the mentally retarded have a constitutional right to receive such individual habilitation as will give each of them a realistic opportunity to lead a more useful and meaningful life and to return to society. That this position is in accord with the applicable legal principles is clear beyond cavil. In an analogous situation involving the mentally ill at Bryce Hospital, this Court said:

> "Adequate and effective treatment is constitutionally required because, absent treatment, the hospital is transformed 'into a penitentiary where one could be held indefinitely for no convicted offense.' Ragsdale v. Overholser, [108 U.S.App.D.C. 308] 281 F.2d 943, 950 (1960). The purpose of involuntary hospitalization for treatment purposes is *treatment* and not mere custodial care or punishment. This is the only justification, from a constitutional standpoint, that allows civil commitments to mental institutions such as Bryce." Wyatt v. Stickney, 325 F.Supp. at 784.

In the context of the right to appropriate care for people civilly confined to public mental institutions, no viable distinction can be made between the mentally ill and the mentally retarded. Because the only constitutional justification for civilly committing a mental retardate, therefore, is habilitation, it follows ineluctably that once committed such a person is possessed of an inviolable constitutional right to habilitation.[6]

maintain that these officials, including, among others, the members of the State Legislature and the treasurer and the comptroller of Alabama, are necessary parties for the attainment of complete relief. Among the relief plaintiffs seek in connection with the state officials is an injunction against the expenditure of state funds for nonessential functions of the state until enough money is available to provide adequately for the financial needs of the Alabama Mental Health Board. In addition, plaintiffs have asked the Court to order the sale of a portion of defendant Mental Health Board's land holdings and other assets and to enjoin the Board from the construction of any physical facilities, including any planned for regional centers.

4. The amici in this case, including the United States of America, the American Orthopsychiatric Association, the American Psychological Association, the American Civil Liberties Union, and the American Association on Mental Deficiency, have performed invaluable service for which this Court is indeed appreciative.

5. The Court will deal in this decree only with residents involuntarily committed to Partlow because no evidence has been adduced tending to demonstrate that any resident is voluntarily confined in that institution. The Court will presume, therefore, that every resident of Partlow is entitled to constitutionally minimum habilitation. The burden falls squarely upon the institution to prove that a particular resident has not been involuntarily committed, and only if defendants satisfy this difficult burden of proof will the Court be confronted with whether the voluntarily committed resident has a right to habilitation.

6. It is interesting to note that the Court's decision with regard to the right of the mentally retarded to habilitation is supported not only by applicable legal authority, but also by a resolution adopted on December 27, 1971, by the General Assembly of the United Nations. That resolution, entitled "Declaration on the Rights of the Mentally Retarded", reads in pertinent part:

Having recognized the existence of this right, the Court now must determine whether prevailing conditions at Partlow conform to minimum standards constitutionally required for a mental retardation institution. The Court's conclusion, compelled by the evidence, is unmistakably clear. Put simply, conditions at Partlow are grossly substandard. Testimony presented by plaintiffs and amici has depicted hazardous and deplorable inadequacies in the institution's operation.[7] Commendably, defendants have offered no rebuttal.[8] At the close of the testimony, the Court, having been impressed by the urgency of the situation, issued an interim emergency order "to protect the lives and well-being of the residents of Partlow." In that order, the Court found that:

"The evidence . . . has vividly and undisputedly portrayed Partlow State School and Hospital as a warehousing institution which, because of its atmosphere of psychological and physical deprivation, is wholly incapable of furnishing [habilitation] to the mentally retarded and is conducive only to the deterioration and the debilitation of the residents. The evidence has reflected further that safety and sanitary conditions at Partlow are substandard to the point of endangering the health and lives of those residing there, that the wards are grossly understaffed, rendering even simple custodial care impossible, and that overcrowding remains a dangerous problem often leading to serious accidents, some of which have resulted in deaths of residents." Wyatt v. Stickney, March 2, 1972. (Unreported Interim Emergency Order.)

Based upon these findings, the Court has concluded that plaintiffs have been denied their right to habilitation and that, pursuant to plaintiffs' request, minimum standards for constitutional care and training must be effectuated at Partlow. Consequently, having determined from a careful study of the evi-

---

". . . The mentally retarded person has a right to proper medical care and physical therapy and to such education, training, rehabilitation and guidance as will enable him to develop his ability and maximum potential."

7. The most comprehensive testimony on the conditions currently prevailing at Partlow was elicited from Dr. Philip Roos, the Executive Director for the National Association for Retarded Children. Dr. Roos inspected Partlow over a two-day period and testified as to his subjective evaluation of the institution. In concluding his testimony, Dr. Roos summarized as follows:

" . . . I feel that the institution and its programs as now conceived are incapable of providing habilitation of the residents. Incarceration, certainly for most of the residents, would I feel have adverse consequences; would tend to develop behaviors which would interfere with successful community functioning. I would anticipate to find stagnation or deterioration in physical, intellectual, and social spheres. The conditions at Partlow today are generally dehumanizing, fostering deviancy, generating self-fulfilling prophecy of parasitism and helplessness. The conditions I would say are hazardous to psychologi-

cal integrity, to health, and in some cases even to life. The administration, the physical plants, the programs, and the institution's articulation with the community and with the consumers reflect destructive models of mental retardation. They hark back to decades ago when the retarded were misperceived as being sick, as being threats to society, or as being subhuman organisms. The new concepts in the field of mental retardation are unfortunately not reflected in Partlow as we see it today—concepts such as normalization, developmental model in orientation toward mental retardation, the thrust of consumer involvement, the trend toward community orientation and decentralization of services; none of these are clearly in evidence in the facility today."

8. Indeed, on February 22, 1972, defendants filed with the Court a statement of position providing in relevant part that:

"Assuming that such a federal constitutional obligation exists . . ., defendants will not contest the factual accuracy of an ultimate finding . . . that defendants have not met the constitutional obligation to provide adequate care at [Partlow], . . ."

At the hearing, defendants adopted the testimony of Dr. Roos in its entirety.

dence that the standards set out in Appendix A to this decree are medical and constitutional minimums, this Court will order their implementation.[9] In so ordering, the Court emphasizes that these standards are, indeed, minimums only peripherally approaching the ideal to which defendants should aspire. It is hoped that the revelations of this case will furnish impetus to defendants to provide physical facilities and habilitation programs at Partlow substantially exceeding medical and constitutional minimums.

■ For the present, however, defendants must realize that the prompt institution of minimum standards to ensure the provision of essential care and training for Alabama's mental retardates is mandatory and that no default can be justified by a want of operating funds. In this regard, the principles applicable to the mentally ill apply with equal force to the mentally retarded. See Wyatt v. Stickney, 325 F.Supp. at 784–785.

■ In addition to requesting that minimum standards be implemented, plaintiffs have asked that defendants be directed to establish a standing human rights committee to guarantee that residents are afforded constitutional and humane habilitation. The evidence reflects that such a committee is needed at Partlow, and this Court will order its initiation. This committee shall have review of all research proposals and all habilitation programs to ensure that the dignity and human rights of residents are preserved. The committee also shall advise and assist residents who allege that their legal rights have been infringed or that the Mental Health Board has failed to comply with judicially ordered guidelines. At reasonable times the committee may inspect the records of the institution and interview residents and staff. At its discretion the committee may consult appropriate, independent specialists who shall be compensated by the defendant Board.[10] The Court will appoint seven members to comprise Partlow's human rights committee, the names and addresses of whom are set forth in Appendix B to this decree. Those who serve on the committee shall be paid on a per diem basis and be reimbursed for travel expenses at the same rate as members of the Alabama Board of Mental Health.

■ Plaintiffs, as well as amici, also have advocated the appointment of a federal master and a professional advisory committee to oversee the implementation of minimum constitutional standards. These parties maintain that conditions at Partlow largely are the product of shameful neglect by the state officials charged with responsibility for that institution. Consequently, plaintiffs and amici insist, these state officials have proved themselves incapable of instituting a constitutional habilitation program. Although this Court acknowledges the intolerable conditions at Partlow and recognizes defendants' past nonfeasances, it, nevertheless, reserves ruling on the appointment of a master and a professional advisory committee.[11] Fed-

9. In addition to the standards detailed in this order, it is appropriate that defendants comply also with the conditions, applicable to mental health institutions, necessary to qualify Partlow for participation in the various programs, such as Medicare and Medicaid, funded by the United States Government. Because many of these conditions of participation have not yet been finally drafted and published, however, this Court will not at this time order that specific Government standards be implemented.

10. The recitation of the licenses of this committee, and similarly, of the committees to be inaugurated at the Bryce and Searcy facilities, is not intended to be inclusive. The human rights committee of each mental health institution shall be authorized, within the limits of reasonableness, to pursue whatever action is necessary to accomplish its function.

11. The Court's decision to reserve ruling on the appointment of a master causes it to reserve ruling also on the appointment of a professional advisory committee to aid the master. Nevertheless, the Court notes that the professional mental health community in the United States has responded with enthusiasm to the pro-

eral courts are reluctant to assume control of any organization, but especially one operated by a state. This Court, always having shared that reluctance, has adhered to a policy of allowing state officials one final opportunity to perform the duties imposed upon them by law. See e. g., Sims v. Amos, 336 F.Supp. 924 (M.D.Ala.1972); Nixon v. Wallace, C.A. No. 3479–N, M.D.Ala., January 22, 1972. Additionally, since the entry of the interim emergency order of March 2, 1972, defendants have worked diligently to upgrade conditions at Partlow in conformity with court-established deadlines. These factors, combined with defendants' expressed intent that the present order will be implemented forthwith and in good faith, cause the Court to withhold its decision on the appointments. Nevertheless, this Court notes, and the evidence demonstrates convincingly, that the operation of Partlow suffers from a virtual absence of administrative and managerial organization. This long-enduring organizational deficiency has been intensified by the lack of dynamic, permanent leadership. Regrettably, the problem has remained unresolved over the span of this litigation and, indeed, has been compounded by the appointment of acting and interim superintendents. The massive program of reform and reorganization to be launched at Partlow requires the guidance of a professionally qualified and experienced administrator. Consequently, this Court will order that defendants employ such an individual on a permanent basis. Should defendants fail to do so, or otherwise fail to comply timely with the provisions of this decree, the Court will be obligated to appoint a master.

■ The Court also reserves ruling upon plaintiffs' motion that defendant Mental Health Board be directed to sell or encumber portions of its extensive land holdings. Similarly, this Court reserves ruling on plaintiffs' motion seeking an injunction against the expenditure of state funds for nonessential functions of the state, and on other aspects of plaintiffs' requested relief designed to ameliorate the financial problems incident to the effectuation of minimum medical and constitutional standards. The Court reserves these rulings despite the fact that the primitive conditions, as well as the atmosphere of futility and despair which envelops both staff and residents at Partlow, can be attributed largely to dire shortages of operating funds. By withholding its decisions, the Court continues to observe its long-standing policy of deferring to state organizations and officials charged by law with specified responsibilities. The responsibility for appropriate funding ultimately must fall, of course, upon the State Legislature and, only to a lesser degree, upon the defendant Mental Health Board. Unfortunately, never, since the founding of Partlow in 1923, has the Legislature adequately provided for that institution.[12] The result of almost fifty years of legislative neglect has been catastrophic; atrocities occur daily.[13] Although, in fairness, the

---

posed initiation of such a committee to assist in the upgrading of Alabama's mental retardation services. Consequently, this Court strongly recommends to defendants that they develop a professional advisory committee comprised of amenable professionals from throughout the country who are able to provide the expertise the evidence reflects is important to the successful implementation of this order.

12. By defendants' admission, Partlow State School and Hospital always has been a "step-child" of the state—never having received the public support it so desperately required. Not until the short term in office of Governor Lurleen Wallace was any emphasis placed upon securing adequate care for Alabama's mentally retarded. Beginning with Mrs. Wallace's tenure in 1966, the budget for mental health has increased but remains woefully short of the minimum required for constitutional care.

13. A few of the atrocious incidents cited at the hearing in this case include the following: (a) a resident was scalded to death by hydrant water; (b) a resident was restrained in a strait jacket for nine years in order to prevent hand and finger

present State Legislature can be faulted relatively little for the crisis situation at Partlow, only that body can rectify the gross omissions of past Legislatures. To shrink from its constitutional obligation at this critical juncture would be to sanction the inhumane conditions which plague the mentally retarded of Alabama. The gravity and immediacy of the situation cannot be overemphasized. At stake is the very preservation of human life and dignity. Consequently, a prompt response from the State Legislature, as well as from the Mental Health Board and other responsible state officials, is imperative.

In the event, though, that the Legislature fails to satisfy its well-defined constitutional obligation and the Mental Health Board, because of lack of funding or any other legally insufficient reason, fails to implement fully the standards herein ordered, it will be necessary for the Court to take affirmative steps, including appointing a master, to ensure that proper funding is realized [14] and that adequate habilitation is available for the mentally retarded of Alabama.

Finally, the Court has determined that this case requires the awarding of a reasonable attorneys' fee to plaintiffs' counsel. The basis for the award and the amount thereof will be considered and treated in a separate order. The fee will · be charged against the defendants as a part of the court costs in this case.

To assist the Court in its determination of how to proceed henceforth, defendants will be directed to prepare and file a report within six months from the date of this decree detailing the implementation of each standard herein ordered. This report shall be comprehensive and shall include a statement of the progress made on each standard not yet completely implemented, specifying the reasons for incomplete performance. The report shall include also a statement of the financing secured since the issuance of this decree and of defendants' plans for procuring whatever additional financing might be required. Upon the basis of this report and other information available, the Court will evaluate defendants' work and, in due course, determine the appropriateness of appointing a master and of granting other requested relief.

Accordingly, it is the order, judgment, and decree of this Court:

1. That defendants be and they are hereby enjoined from failing to implement fully and with dispatch each of the standards set forth in Appendix A attached hereto and incorporated as a part of this decree;

2. That a human rights committee for Partlow State School and Hospital be and is hereby designated and appointed. The members thereof are listed in Appendix B attached hereto and incorporated herein. This committee shall have the purposes, functions, and spheres of operation previously set forth in this order. The members of the committee shall be paid on a per diem basis and be reimbursed for travel expenses at the same rate as members of the Alabama Board of Mental Health;

3. That defendants, within 60 days from this date, employ a professionally qualified and experienced administrator to serve Partlow State School and Hospital on a permanent basis;

sucking; (c) a resident was inappropriately confined in seclusion for a period of years, and (d) a resident died from the insertion by another resident of a running water hose into his rectum. Each of these incidents could have been avoided had adequate staff and facilities been available.

14. The Court realizes that the Legislature is not due back in regular session until May, 1973. Nevertheless, special sessions of the Legislature are frequent occurrences in Alabama, and there has never been a time when such a session was more urgently required. If the Legislature does not act promptly to appropriate the necessary funding for mental health, the Court will be compelled to grant plaintiffs' motion to add various state officials and agencies as additional parties to this litigation and to utilize other avenues of fund raising.

4. That defendants, within six months from this date, prepare and file with this Court a report reflecting in detail the progress on the implementation of this order. This report shall be comprehensive and precise and shall explain the reasons for incomplete performance in the event the defendants have not met a standard in its entirety. The report also shall include a financial statement and an up-to-date timetable for full compliance;

5. That the court costs incurred in this proceeding, including a reasonable attorneys' fee for plaintiffs' lawyers be and they are hereby taxed against the defendants;

6. That jurisdiction of this cause be and the same is hereby specifically retained.

It is further ordered that a ruling on plaintiffs' motion for further relief, including the appointment of a master, filed March 15, 1972, be and the same is hereby reserved.

## APPENDIX A

MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE HABILITATION OF THE MENTALLY RETARDED

I. *Definitions*

The terms used herein below are defined as follows:

a. "Institution"—Partlow State School and Hospital.

b. "Residents"—All persons who are now confined and all persons who may in the future be confined at Partlow State School and Hospital.

c. "Qualified Mental Retardation Professional"—

(1) a psychologist with a doctoral or master's degree from an accredited program and with specialized training or one year's experience in treating the mentally retarded;

(2) a physician licensed to practice in the State of Alabama, with specialized training or one's year's experience in treating the mentally retarded;

(3) an educator with a master's degree in special education from an accredited program;

(4) a social worker with a master's degree from an accredited program and with specialized training or one year's experience in working with the mentally retarded;

(5) a physical, vocational or occupational therapist licensed to practice in the State of Alabama who is a graduate of an accredited program in physical, vocational or occupational therapy, with specialized training or one year's experience in treating the mentally retarded;

(6) a registered nurse with specialized training or one year of experience treating the mentally retarded under the supervision of a Qualified Mental Retardation Professional.

d. "Resident Care Worker"—an employee of the institution, other than a Qualified Mental Retardation Professional, whose duties require regular contact with or supervision of residents.

e. "Habilitation"—the process by which the staff of the institution assists the resident to acquire and maintain those life skills which enable him to cope more effectively with the demands of his own person and of his environment and to raise the level of his physical, mental, and social efficiency. Habilitation includes but is not limited to programs of formal, structured education and treatment.

f. "Education"—the process of formal training and instruction to facilitate the intellectual and emotional development of residents.

g. "Treatment"—the prevention, amelioration and/or cure of a resident's physical disabilities or illnesses.

h. "Guardian"—a general guardian of a resident, unless the general guardian is missing, indifferent to the welfare of the resident or has an interest adverse to the resident. In such a case, *guardian* shall be defined as an individual appointed by an appropriate court on the motion of the superintendent, such guardian not to be in the control or in the employ of the Alabama Board of Mental Health.

i. "Express and Informed Consent"— the uncoerced decision of a resident who has comprehension and can signify assent or dissent.

## II. *Adequate Habilitation of Residents*

1. Residents shall have a right to habilitation, including medical treatment, education and care, suited to their needs, regardless of age, degree of retardation or handicapping condition.

2. Each resident has a right to a habilitation program which will maximize his human abilities and enhance his ability to cope with his environment. The institution shall recognize that each resident, regardless of ability or status, is entitled to develop and realize his fullest potential. The institution shall implement the principle of normalization so that each resident may live as normally as possible.

3. a. No person shall be admitted to the institution unless a prior determination shall have been made [1] that residence in the institution is the least restrictive habilitation setting feasible for that person.

b. No mentally retarded person shall be admitted to the institution if services and programs in the community can afford adequate habilitation to such person.

c. Residents shall have a right to the least restrictive conditions necessary to achieve the purposes of habilitation. To this end, the institution shall make every attempt to move residents from (1) more to less structured living; (2) larger to smaller facilities; (3) larger to smaller living units; (4) group to individual residence; (5) segregated from the community to integrated into the community living; (6) dependent to independent living.

4. No borderline or mildly mentally retarded person shall be a resident of the institution. For purposes of this standard, a borderline retarded person is defined as an individual who is functioning between one and two standard deviations below the mean on a standardized intelligence test such as the Stanford Binet Scale and on measures of adaptive behavior such as the American Association on Mental Deficiency Adaptive Behavior Scale. A mildly retarded person is defined as an individual who is functioning between two and three standard deviations below the mean on a standardized intelligence test such as the Stanford Binet Scale and on a measure of adaptive behavior such as the American Association on Mental Deficiency Adaptive Behavior Scale.

5. Residents shall have a right to receive suitable educational services regardless of chronological age, degree of retardation or accompanying disabilities or handicaps.

a. The institution shall formulate a written statement of educational objectives that is consistent with the institution's mission as set forth in Standard 2, *supra,* and the other standards proposed herein.

b. School-age residents shall be provided a full and suitable educational program. Such educational program

1. See Standard 7, *infra.*

shall meet the following minimum standards:

| | Mild [2] | Moderate | Severe/Profound |
|---|---|---|---|
| (1) Class Size | 12 | 9 | 6 |
| (2) Length of school year (in months) | 9–10 | 9–10 | 11–12 |
| (3) Minimum length of school day (in hours) | 6 | 6 | 6 |

6. Residents shall have a right to receive prompt and adequate medical treatment for any physical ailments and for the prevention of any illness or disability. Such medical treatment shall meet standards of medical practice in the community.

### III. *Individualized Habilitation Plans*

7. Prior to his admission to the institution, each resident shall have a comprehensive social, psychological, educational, and medical diagnosis and evaluation by appropriate specialists to determine if admission is appropriate.

   a. Unless such preadmission evaluation has been conducted within three months prior to the admission, each resident shall have a new evaluation at the institution to determine if admission is appropriate.

   b. When undertaken at the institution, preadmission diagnosis and evaluation shall be completed within five days.

8. Within 14 days of his admission to the institution, each resident shall have an evaluation by appropriate specialists for programming purposes.

9. Each resident shall have an individualized habilitation plan formulated by the institution. This plan shall be developed by appropriate Qualified Mental Retardation Professionals and implemented as soon as possible but no later than 14 days after the resident's admission to the institution. An interim program of habilitation, based on the preadmission evaluation conducted pursuant to Standard 7, *supra,* shall commence promptly upon the resident's admission. Each individualized habilitation plan shall contain:

   a. a statement of the nature of the specific limitations and specific needs of the resident;

   b. a description of intermediate and long-range habilitation goals with a projected timetable for their attainment;

   c. a statement of, and an explanation for, the plan of habilitation for achieving these intermediate and long-range goals;

   d. a statement of the least restrictive setting for habilitation necessary to achieve the habilitation goals of the resident;

   e. a specification of the professionals and other staff members who are responsible for the particular resident's attaining these habilitation goals;

   f. criteria for release to less restrictive settings for habilitation, including criteria for discharge and a projected date for discharge.

10. As part of his habilitation plan, each resident shall have an individualized post-institutionalization plan. This plan shall be developed by a Qualified Mental Retardation Professional who shall begin preparation of such plan prior to the resident's admission to the institution and shall complete such plan as soon as practicable. The guardian or next of kin of the resident and the resident, if able to give informed consent, shall be consulted in the development of such plan and shall be informed of the content of such plan.

2. As is reflected in Standard 4, *supra,* it is contemplated that no mildly retarded persons be residents of the institution. However, until those mildly retarded who are presently residents are removed to more suitable locations and/or facilities, some provision must be made for their educational program.

11. In the interests of continuity of care, one Qualified Mental Retardation Professional shall be responsible for supervising the implementation of the habilitation plan, integrating the various aspects of the habilitation program, and recording the resident's progress as measured by objective indicators. This Qualified Mental Retardation Professional shall also be responsible for ensuring that the resident is released when appropriate to a less restrictive habilitation setting.

12. The habilitation plan shall be continuously reviewed by the Qualified Mental Retardation Professional responsible for supervising the implementation of the plan and shall be modified if necessary. In addition, six months after admission and at least annually thereafter, each resident shall receive a comprehensive psychological, social, educational and medical diagnosis and evaluation, and his habilitation plan shall be reviewed by an interdisciplinary team of no less than two Qualified Mental Retardation Professionals and such resident care workers as are directly involved in his habilitation and care.

13. In addition to habilitation for mental disorders, people confined at mental health institutions also are entitled to and shall receive appropriate treatment for physical illnesses such as tuberculosis.[3] In providing medical care, the State Board of Mental Health shall take advantage of whatever community-based facilities are appropriate and available and shall coordinate the resident's habilitation for mental retardation with his medical treatment.

14. Complete records for each resident shall be maintained and shall be readily available to Qualified Mental Retardation Professionals and to the resident care workers who are directly involved with the particular resident. All information contained in a resident's records shall be considered privileged and confidential. The guardian, next of kin, and any person properly authorized in writing by the resident, if such resident is capable of giving informed consent, or by his guardian or next of kin, shall be permitted access to the resident's records. These records shall include:

a. Identification data, including the resident's legal status;

b. The resident's history, including but not limited to:

(1) family data, educational background, and employment record;

(2) prior medical history, both physical and mental, including prior institutionalization;

c. The resident's grievances if any;

d. An inventory of the resident's life skills;

e. A record of each physical examination which describes the results of the examination;

f. A copy of the individual habilitation plan and any modifications thereto and an appropriate summary which will guide and assist the resident care workers in implementing the resident's program;

g. The findings made in periodic reviews of the habilitation plan (see Standard 12, *supra*), which findings shall include an analysis of the successes and failures of the habilitation program and shall direct whatever modifications are necessary;

h. A copy of the post-institutionalization plan and any modifications thereto, and a summary of the steps that have been taken to implement that plan;

i. A medication history and status, pursuant to Standard 22, *infra;*

---

3. Approximately 50 patients at Bryce-Searcy are tubercular as also are approximately four residents at Partlow.

j. A summary of each significant contact by a Qualified Mental Retardation Professional with the resident;

k. A summary of the resident's response to his program, prepared by a Qualified Mental Retardation Professional involved in the resident's habilitation and recorded at least monthly. Such response, wherever possible, shall be scientifically documented.

l. A monthly summary of the extent and nature of the resident's work activities described in the Standard 33(b), *infra* and the effect of such activity upon the resident's progress along the habilitation plan;

m. A signed order by a Qualified Mental Retardation Professional for any physical restraints, as provided in Standard 26(a) (1), *infra;*

n. A description of any extraordinary incident or accident in the institution involving the resident, to be entered by a staff member noting personal knowledge of the incident or accident or other source of information, including any reports of investigations of resident mistreatment, as required by Standard 28, *infra;*

o. A summary of family visits and contacts;

p. A summary of attendance and leaves from the institution;

q. A record of any seizures, illnesses, treatments thereof, and immunizations.

IV. *Humane Physical and Psychological Environment*

15. Residents shall have a right to dignity, privacy and humane care.

16. Residents shall lose none of the rights enjoyed by citizens of Alabama and of the United States solely by reason of their admission or commitment to the institution, except as expressly determined by an appropriate court.

17. No person shall be presumed mentally incompetent solely by reason of his admission or commitment to the institution.

18. The opportunity for religious worship shall be accorded to each resident who desires such worship. Provisions for religious worship shall be made available to all residents on a nondiscriminatory basis. No individual shall be coerced into engaging in any religious activities.

19. Residents shall have the same rights to telephone communication as patients at Alabama public hospitals, except to the extent that a Qualified Mental Retardation Professional responsible for formulation of a particular resident's habilitation plan (see Standard 9, *supra*) writes an order imposing special restrictions and explains the reasons for any such restrictions. The written order must be renewed semiannually if any restrictions are to be continued. Residents shall have an unrestricted right to visitation, except to the extent that a Qualified Mental Retardation Professional responsible for formulation of a particular resident's habilitation plan (see Standard 9, *supra*) writes an order imposing special restrictions and explains the reasons for any such restrictions. The written order must be renewed semiannually if any restrictions are to be continued.

20. Residents shall be entitled to send and receive sealed mail. Moreover, it shall be the duty of the institution to facilitate the exercise of this right by furnishing the necessary materials and assistance.

21. The institution shall provide, under appropriate supervision, suitable opportunities for the resident's interaction with members of the opposite sex, except where a Qualified Mental Retardation Professional responsible for the formulation of a particular resident's habilitation plan writes an order to the contrary and explains the reasons therefor.

22. *Medication*:

a. No medication shall be administered unless at the written order of a physician.

b. Notation of each individual's medication shall be kept in his medical records (Standard 14(i) *supra*). At least weekly the attending physician shall review the drug regimen of each resident under his care. All prescriptions shall be written with a termination date, which shall not exceed 30 days.

c. Residents shall have a right to be free from unnecessary or excessive medication. The resident's records shall state the effects of psychoactive medication on the resident. When dosages of such are changed or other psychoactive medications are prescribed, a notation shall be made in the resident's record concerning the effect of the new medication or new dosages and the behavior changes, if any, which occur.

d. Medication shall not be used as punishment, for the convenience of staff, as a substitute for a habilitation program, or in quantities that interfere with the resident's habilitation program.

e. Pharmacy services at the institution shall be directed by a professionally competent pharmacist licensed to practice in the State of Alabama. Such pharmacist shall be a graduate of a school of pharmacy accredited by the American Council on Pharmaceutical Education. Appropriate officials of the institution, at their option, may hire such a pharmacist or pharmacists fulltime or, in lieu thereof, contract with outside pharmacists.

f. Whether employed fulltime or on a contract basis, the pharmacist shall perform duties which include but are not limited to the following:

(1) Receiving the original, or direct copy, of the physician's drug treatment order;

(2) Reviewing the drug regimen, and any changes, for potentially adverse reactions, allergies, interactions, contraindications, rationality, and laboratory test modifications and advising the physician of any recommended changes, with reasons and with an alternate drug regimen;

(3) Maintaining for each resident an individual record of all medications (prescription and nonprescription) dispensed, including quantities and frequency of refills;

(4) Participating, as appropriate, in the continuing interdisciplinary evaluation of individual residents for the purposes of initiation, monitoring, and follow-up of individualized habilitation programs.

g. Only appropriately trained staff shall be allowed to administer drugs.

23. Seclusion, defined as the placement of a resident alone in a locked room, shall not be employed. Legitimate "time out" procedures may be utilized under close and direct professional supervision as a technique in behavior-shaping programs.

24. Behavior modification programs involving the use of noxious or aversive stimuli shall be reviewed and approved by the institution's Human Rights Committee and shall be conducted only with the express and informed consent of the affected resident, if the resident is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and with legal counsel. Such behavior modification programs shall be conducted only under the supervision of and in the presence of a Qualified Mental Retardation Professional who has had proper training in such techniques.

25. Electric shock devices shall be considered a research technique for the purpose of these standards. Such

devices shall only be used in extra-ordinary circumstances to prevent self-mutilation leading to repeated and possibly permanent physical damage to the resident and only after alternative techniques have failed. The use of such devices shall be subject to the conditions prescribed in Standard 24, *supra,* and Standard 29, *infra,* and shall be used only under the direct and specific order of the superintendent.

26. Physical restraint shall be employed only when absolutely necessary to protect the resident from injury to himself or to prevent injury to others. Restraint shall not be employed as punishment, for the convenience of staff, or as a substitute for a habilitation program. Restraint shall be applied only if alternative techniques have failed and only if such restraint imposes the least possible restriction consistent with its purpose.

a. Only Qualified Mental Retardation Professionals may authorize the use of restraints.

(1) Orders for restraints by the Qualified Mental Retardation Professionals shall be in writing and shall not be in force for longer than 12 hours.

(2) A resident placed in restraint shall be checked at least every 30 minutes by staff trained in the use of restraints, and a record of such checks shall be kept.

(3) Mechanical restraints shall be designed and used so as not to cause physical injury to the resident and so as to cause the least possible discomfort.

(4) Opportunity for motion and exercise shall be provided for a period of not less than ten minutes during each two hours in which restraint is employed.

(5) Daily reports shall be made to the superintendent by those Qualified Mental Retardation Professionals ordering the use of restraints, summarizing all such uses of restraint, the types used, the duration, and the reasons therefor.

b. The institution shall cause a written statement of this policy to be posted in each living unit and circulated to all staff members.

27. Corporal punishment shall not be permitted.

28. The institution shall prohibit mistreatment, neglect or abuse in any form of any resident.

a. Alleged violations shall be reported immediately to the superintendent and there shall be a written record that:

(1) Each alleged violation has been thoroughly investigated and findings stated;

(2) The results of such investigation are reported to the superintendent and to the commissioner within 24 hours of the report of the incident. Such reports shall also be made to the institution's Human Rights Committee monthly and to the Alabama Board of Mental Health at its next scheduled public meeting.

b. The institution shall cause a written statement of this policy to be posted in each cottage and building and circulated to all staff members.

29. Residents shall have a right not to be subjected to experimental research without the express and informed consent of the resident, if the resident is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and with legal counsel. Such proposed research shall first have been reviewed and approved by the institution's Human Rights Committee before such consent shall be sought. Prior to such approval the institution's Human Rights Committee shall determine that such research complies with the princi-

ples of the Statement on the Use of Human Subjects for Research of the American Association on Mental Deficiency and with the principles for research involving human subjects required by the United States Department of Health, Education and Welfare for projects supported by that agency.

30. Residents shall have a right not to be subjected to any unusual or hazardous treatment procedures without the express and informed consent of the resident, if the resident is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and legal counsel. Such proposed procedures shall first have been reviewed and approved by the institution's Human Rights Committee before such consent shall be sought.

31. Residents shall have a right to regular physical exercise several times a week. It shall be the duty of the institution to provide both indoor and outdoor facilities and equipment for such exercise.

32. Residents shall have a right to be outdoors daily in the absence of contrary medical considerations.

33. The following rules shall govern resident labor:

a. *Institution Maintenance*

(1) No resident shall be required to perform labor which involves the operation and maintenance of the institution or for which the institution is under contract with an outside organization. Privileges or release from the institution shall not be conditioned upon the performance of labor covered by this provision. Residents may voluntarily engage in such labor if the labor is compensated in accordance with the minimum wage laws of the Fair Labor Standards Act, 29 U.S.C. § 206 as amended, 1966.

(2) No resident shall be involved in the care (feeding, clothing, bathing), training, or supervision of other residents unless he:

(a) has volunteered;

(b) has been specifically trained in the necessary skills;

(c) has the humane judgment required for such activities;

(d) is adequately supervised; and

(e) is reimbursed in accordance with the minimum wage laws of the Fair Labor Standards Act, 29 U.S.C. § 206 as amended, 1966.

b. *Training Tasks and Labor*

(1) Residents may be required to perform vocational training tasks which do not involve the operation and maintenance of the institution, subject to a presumption that an assignment of longer than three months to any task is not a training task, provided the specific task or any change in task assignment is:

(a) An integrated part of the resident's habilitation plan and approved as a habilitation activity by a Qualified Mental Retardation Professional responsible for supervising the resident's habilitation;

(b) Supervised by a staff member to oversee the habilitation aspects of the activity.

(2) Residents may voluntarily engage in habilitative labor at non-program hours for which the institution would otherwise have to pay an employee, provided the specific labor or any change in labor is:

(a) An integrated part of the resident's habilitation plan and approved as a habilitation activity by a Qualified Mental Retardation Professional responsible for supervising the resident's habilitation;

(b) Supervised by a staff member to oversee the habilitation aspects of the activity; and

(c) Compensated in accordance with the minimum wage laws of the Fair Labor Standards Act, 29 U.S.C. § 206 as amended, 1966.

c. *Personal Housekeeping* Residents may be required to perform tasks of a personal housekeeping nature such as the making of one's own bed.

d. Payment to residents pursuant to this paragraph shall not be applied to the costs of institutionalization.

e. Staffing shall be sufficient so that the institution is not dependent upon the use of residents or volunteers for the care, maintenance or habilitation of other residents or for income-producing services. The institution shall formulate a written policy to protect the residents from exploitation when they are engaged in productive work.

√ 34. A nourishing, well-balanced diet shall be provided each resident.

a. The diet for residents shall provide at a minimum the Recommended Daily Dietary Allowance as developed by the National Academy of Sciences. Menus shall be satisfying and shall provide the Recommended Daily Dietary Allowances. In developing such menus, the institution shall utilize the Moderate Cost Food Plan of the United States Department of Agriculture. The institution shall not spend less per patient for raw food, including the value of donated food, than the most recent per person costs of the Moderate Cost Food Plan for the Southern Region of the United States, as compiled by the United States Department of Agriculture, for appropriate groupings of residents, discounted for any savings which might result from institutional procurement of such food.

b. Provision shall be made for special therapeutic diets and for substitutes at the request of the resident, or his guardian or next of kin, in accordance with the religious requirements of any resident's faith.

c. Denial of a nutritionally adequate diet shall not be used as punishment.

d. Residents, except for the non-mobile, shall eat or be fed in dining rooms.

√ 35. Each resident shall have an adequate allowance of neat, clean, suitably fitting and seasonable clothing.

a. Each resident shall have his own clothing, which is properly and inconspicuously marked with his name, and he shall be kept dressed in this clothing. The institution has an obligation to supply an adequate allowance of clothing to any residents who do not have suitable clothing of their own. Residents shall have the opportunity to select from various types of neat, clean, and seasonable clothing. Such clothing shall be considered the resident's throughout his stay in the institution.

b. Clothing both in amount and type shall make it possible for residents to go out of doors in inclement weather, to go for trips or visits appropriately dressed, and to make a normal appearance in the community.

c. Nonambulatory residents shall be dressed daily in their own clothing, including shoes, unless contraindicated in written medical orders.

d. Washable clothing shall be designed for multiply handicapped residents being trained in self-help skills, in accordance with individual needs.

e. Clothing for incontinent residents shall be designed to foster comfortable sitting, crawling and/or walking, and toilet training.

f. A current inventory shall be kept of each resident's personal and clothing items.

g. The institution shall make provision for the adequate and regular laundering of the residents' clothing.

√ 36. Each resident shall have the right to keep and use his own personal possessions except insofar as such clothes or personal possessions may be determined to be dangerous, either to himself or to others, by a Qualified Mental Retardation Professional.

√ 37. a. Each resident shall be assisted in learning normal grooming practices

with individual toilet articles, including soap and toothpaste, that are available to each resident.

b. Teeth shall be brushed daily with an effective dentifrice. Individual brushes shall be properly marked, used, and stored.

c. Each resident shall have a shower or tub bath, at least daily, unless medically contraindicated.

d. Residents shall be regularly scheduled for hair cutting and styling, in an individualized manner, by trained personnel.

e. For residents who require such assistance, cutting of toe nails and fingernails shall be scheduled at regular intervals.

38. *Physical Facilities* A resident has a right to a humane physical environment within the institutional facilities. These facilities shall be designed to make a positive contribution to the efficient attainment of the habilitation goals of the institution.

   a. *Resident Unit* All ambulatory residents shall sleep in single rooms or in multi-resident rooms of no more than six persons. The number of nonambulatory residents in a multi-resident room shall not exceed ten persons. There shall be allocated a minimum of 80 square feet of floor space per resident in a multi-resident room. Screens or curtains shall be provided to ensure privacy. Single rooms shall have a minimum of 100 square feet of floor space. Each resident shall be furnished with a comfortable bed with adequate changes of linen, a closet or locker for his personal belongings, and appropriate furniture such as a chair and a bedside table, unless contraindicated by a Qualified Mental Retardation Professional who shall state the reasons for any such restriction.

b. *Toilets and Lavatories* There shall be one toilet and one lavatory for each six residents. A lavatory shall be provided with each toilet facility. The toilets shall be installed in separate stalls for ambulatory residents, or in curtained areas for non-ambulatory residents, to ensure privacy, shall be clean and free of odor, and shall be equipped with appropriate safety devices for the physically handicapped. Soap and towels and/or drying mechanisms shall be available in each lavatory. Toilet paper shall be available in each toilet facility.

c. *Showers* There shall be one tub or shower for each eight residents. If a central bathing area is provided, each tub or shower shall be divided by curtains to ensure privacy. Showers and tubs shall be equipped with adequate safety accessories.

d. *Day Room* The minimum day room area shall be 40 square feet per resident. Day rooms shall be attractive and adequately furnished with reading lamps, tables, chairs, television, radio and other recreational facilities. They shall be conveniently located to residents' bedrooms and shall have outside windows. There shall be at least one day room area on each bedroom floor in a multi-story facility. Areas used for corridor traffic shall not be counted as day room space; nor shall a chapel with fixed pews be counted as a day room area.

e. *Dining Facilities* The minimum dining room area shall be ten square feet per resident. The dining room shall be separate from the kitchen and shall be furnished with comfortable chairs and tables with hard, washable surfaces.

f. *Linen Servicing and Handling* The institution shall provide adequate facilities and equipment for the expeditious handling of clean and soiled bedding and other linen. There must be frequent changes of bedding and other linen, but in any event no less than every seven days, to assure sanitation and resident comfort. After soiling by an incontinent resident, bedding and linen must be immediately changed and removed from the living unit. Soiled linen and laundry shall be removed from the living unit daily.

g. *Housekeeping* Regular housekeeping and maintenance procedures which will ensure that the institution is maintained in a safe, clean, and attractive condition shall be developed and implemented.

h. *Nonambulatory Residents* There must be special facilities for nonambulatory residents to assure their safety and comfort, including special fittings on toilets and wheelchairs. Appropriate provision shall be made to permit nonambulatory residents to communicate their needs to staff.

i. *Physical Plant*

(1) Pursuant to an established routine maintenance and repair program, the physical plant shall be kept in a continuous state of good repair and operation so as to ensure the health, comfort, safety and well-being of the residents and so as not to impede in any manner the habilitation programs of the residents.

(2) Adequate heating, air conditioning and ventilation systems and equipment shall be afforded to maintain temperatures and air changes which are required for the comfort of residents at all times. Ventilation systems shall be adequate to remove steam and offensive odors or to mask such odors. The temperature in the institution shall not exceed 83°F nor fall below 68°F.

(3) Thermostatically controlled hot water shall be provided in adequate quantities and maintained at the required temperature for resident use (110°F at the fixture) and for mechanical dishwashing and laundry use (180°F at the equipment). Thermostatically controlled hot water valves shall be equipped with a double valve system that provides both auditory and visual signals of valve failures.

(4) Adequate refuse facilities shall be provided so that solid waste, rubbish and other refuse will be collected and disposed of in a manner which will prohibit transmission of disease and not create a nuisance or fire hazard or provide a breeding place for rodents and insects.

(5) The physical facilities must meet all fire and safety standards established by the state and locality. In addition, the institution shall meet such provisions of the Life Safety Code of the National Fire Protection Association (21st edition, 1967) as are applicable to it.

V. *Qualified Staff in Numbers Sufficient to Provide Adequate Habilitation*

39. Each Qualified Mental Retardation Professional and each physician shall meet all licensing and certification requirements promulgated by the State of Alabama for persons engaged in private practice of the same profession elsewhere in Alabama. Other staff members shall meet the same licensing and certification requirements as persons who engage in private practice of their specialty elsewhere in Alabama.

a. All resident care workers who have not had prior clinical ex-

perience in a mental retardation institution shall have suitable orientation training.

b. Staff members on all levels shall have suitable, regularly scheduled in-service training.

40. Each resident care worker shall be under the direct professional superversion of a Qualified Mental Retardation Professional.

41. *Staffing Ratios*

a. Qualified staff in numbers sufficient to administer adequate habilitation shall be provided. Such staffing shall include but not be limited to the following fulltime professional and special services. Qualified Mental Retardation Professionals trained in particular disciplines may in appropriate situations perform services or functions traditionally performed by members of other disciplines. Substantial changes in staff deployment may be made with the prior approval of this Court upon a clear and convincing demonstration that the proposed deviation from this staffing structure would enhance the habilitation of the residents. Professional staff shall possess the qualifications of Qualified Mental Retardation Professionals as defined herein unless expressly stated otherwise.

|  | Mild [4] | Moderate | Severe/ Profound |
|---|---|---|---|
| b. *Unit* | 60 | 60 | 60 |
| (1) Psychologists | 1:60 | 1:60 | 1:60 |
| (2) Social Workers | 1:60 | 1:60 | 1:60 |
| (3) Special Educators (shall include an equal number of master's degree and bachelor's degree holders in special education) | 1:15 | 1:10 | 1:30 |
| (4) Vocational Therapists | 1:60 | 1:60 | — |
| (5) Recreational Therapists (shall be master's degree graduates from an accredited program) | 1:60 | 1 60 | 1:60 |
| (6) Occupational Therapists | — | — | 1:60 |
| (7) Registered Nurses | 1:60 | 1:60 | 1:12 |
| (8) Resident Care Workers | 1:2.5 | 1:1.25 | 1:1 |

The following professional staff shall be fulltime employees of the institution who shall not be assigned to a single unit but who shall be available to meet the needs of any resident of the institution:

| | |
|---|---|
| Physicians | 1:200 |
| Physical Therapists | 1:100 |
| Speech & Hearing Therapists | 1:100 |
| Dentists [5] | 1:200 |
| Social Workers (shall be principally involved in the placement of residents in the community and shall include bachelor's degree graduates from an accredited program in social work) | 1:80 |
| Chaplains [6] | 1:200 |

c. Qualified medical specialists of recognized professional ability shall be available for specialized care and consultation. Such specialist services shall include a psychiatrist on a one-day per week basis, a physiatrist on a two-day per week basis, and any other medical or health-related specialty available in the community.

VI. *Miscellaneous*

42. The guardian or next of kin of each resident shall promptly, upon resident's admission, receive a written copy of all the above standards for adequate habilitation. Each resident, if the resident is able to comprehend, shall promptly upon his admission be orally informed in clear language of the above standards and, where appropriate, be provided with a written copy.

43. The superintendent shall report in writing to the next of kin or guardian of the resident at least every six months on the resident's educational, vocational and living skills progress and medical condition. Such report shall also state any appropriate habilitation program which has

4. See n. 2, *supra*.

5. Defendants may, in lieu of employing fulltime dentists, contract outside the institution for dental care. In this event the dental services provided the residents must include (a) complete dental examinations and appropriate corrective dental work for each resident each six months and (b) a dentist on call 24 hours per day for emergency work.

6. Defendants may, in lieu of employing fulltime chaplains, recruit, upon the ratio shown above, interfaith volunteer chaplains.

not been afforded to the resident because of inadequate habilitation resources.

44. a. No resident shall be subjected to a behavior modification program designed to eliminate a particular pattern of behavior without prior certification by a physician that he has examined the resident in regard to behavior to be extinguished and finds that such behavior is not caused by a physical condition which could be corrected by appropriate medical procedures.

b. No resident shall be subjected to a behavior modification program which attempts to extinguish socially appropriate behavior or to develop new behavior patterns when such behavior modifications serve only institutional convenience.

45. No resident shall have any of his organs removed for the purpose of transplantation without compliance with the procedures set forth in Standard 30, *supra*, and after a court hearing on such transplantation in which the resident is represented by a guardian *ad litem*. This standard shall apply to any other surgical procedure which is undertaken for reasons other than therapeutic benefit to the resident.

46. Within 90 days of the date of this order, each resident of the institution shall be evaluated as to his mental, emotional, social, and physical condition. Such evaluation or reevaluation shall be conducted by an interdisciplinary team of Qualified Mental Retardation Professionals who shall use professionally recognized tests and examination procedures. Each resident's guardian, next of kin or legal representative shall be contacted and his readiness to make provisions for the resident's care in the community shall be ascertained. Each resident shall be returned to his family, if adequately habilitated, or assigned to the least restrictive habilitation setting.

47. Each resident discharged to the community shall have a program of transitional habilitation assistance.

48. The institution shall continue to suspend any new admissions of residents until all of the above standards of adequate habilitation have been met.

49. No person shall be admitted to any publicly supported residential instition caring for mentally retarded persons unless such institution meets the above standards.

## APPENDIX B

### PARTLOW HUMAN RIGHTS COMMITTEE

1. Ms. Harriet S. Tillman—Chairman —3544 Brookwood Road, Birmingham, Alabama

2. Dr. J. W. Benton —3008 Brook Hollow Lane, Birmingham, Alabama

3. Mr. Paul R. Davis —Tuscaloosa News, Tuscaloosa, Alabama 35401

4. Reverend Robert Keever —University Presbyterian Church, Tuscaloosa, Alabama 35401

5. Ms. Nancy Poole —1836 Dorchester, Birmingham, Alabama

6. Mr. Eugene Ward —c/o Partlow State School and Hospital, Tuscaloosa, Alabama 35401

7. Ms. Estelle Witherspoon —Alberta, Alabama 36720

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF ALABAMA, NORTHERN DIVISION

Ricky WYATT, by and through
his aunt and legal guardian,
Mrs. W. C. Rawlins, Jr., et al.,
for themselves jointly and sev-
erally and for all others sim-
ilarly situated,

Plaintiffs,

v.

Dr. Stonewall B. STICKNEY,
as Commissioner of Mental
Health and the State of Ala-
bama Mental Health Officer,
et al.

Defendants,
United States of America et al.,
Amici Curiae.

CIVIL ACTION NO. 3195-N

## On Request for Attorneys' Fees

■ Once again this Court is con-
fronted with a request for attorneys'
fees made by plaintiffs involved in *pro
bono publico* litigation, and the request
is well taken.[1] In 1967, over three years
prior to the initiation of this suit, the
American Association on Mental Defi-
ciency [hereinafter referred to as
AAMD] conducted a study of Partlow
State School and Hospital.[2] That study,
which was made available to Partlow's
Director and to the State Mental Health
Board, portrayed the institution as one
enveloped by an atmosphere of despair,
hopelessness and depression. The AAMD
found Partlow grossly deficient virtually
in every respect, including habilitation
programming, staffing, staff training,
community relations and residential fa-
cilities. At the time of the study, Part-
low's administration and organization
were found to be chaotic. The institu-
tion had promulgated no statement of
its philosophy and objectives, and what

emergency and safety procedures existed
were evaluated as primitive and ineffec-
tive. Evidence offered at trial demon-
strated that defendants also had knowl-
edge prior to the initiation of this suit
of the unconstitutionally substandard
conditions at Bryce and Searcy Hospitals.
Nevertheless, although many of the in-
adequacies known by defendants to exist
in Alabama's mental health institutions
could have been corrected without large
expenditures, little, if any, progress to-
ward upgrading conditions was realized
until this case was initiated. From a
legal standpoint, such nonfeasance on the
part of defendants constitutes bad faith
which necessitated the expense of litiga-
tion. This bad faith forms a valid basis
for the granting of attorneys' fees. See
e. g., Vaughan v. Atkinson, 369 U.S. 527,
530-531, 82 S.Ct. 997, 8 L.Ed.2d 88
(1961).

■ A second, and more appropriate,
justification for the Court's award, how-
ever, evolves from a kind of benefit

1. Other such cases in which this Court has
found a valid basis for the awarding of a
reasonable attorneys' fee include Sims v.
Amos, 336 F.Supp. 924 (M.D.Ala.1972)
(three judges) and NAACP v. Allen, 340
F.Supp. 703 (M.D.Ala.1972).

2. American Ass'n on Mental Deficiency In-
stitutional Evaluation Project, Final Re-
port For Partlow State School & Hospital
(1967).

theory. See Mills v. Electro Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 2d 593 (1970). Plaintiffs bringing suits to enforce a strong national policy often benefit a class of people far broader than those actually involved in the litigation. Such plaintiffs, who are said to act as "private attorneys general," Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), rarely recover significant damage awards. Moreover, if a violation of civil rights is alleged or if some other challenge to constituted authority is involved, these plaintiffs and their attorneys may confront other, more personal obstacles to the maintenance of their public-minded suits. See NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972). Consequently, in order to eliminate the impediments to *pro bono publico* litigation and to carry out congressional policy, an award of attorneys' fees not only is essential but also is legally required. See Lee v. Southern Home Sites, 444 F.2d 143 (5th Cir. 1971); Sims v. Amos, 336 F.Supp. 924 (M.D.Ala.1972); NAACP v. Allen, supra; Bradley v. School Bd. of Richmond, 53 F.R.D. 28 (E.D.Va.1971).

The present action clearly is one intended to be encouraged by the benefit rule. By successfully prosecuting this suit, plaintiffs have benefitted not only the present residents of Bryce, Partlow and Searcy but also everyone who will be confined to those institutions in the future. Veritably, it is no overstatement to assert that all of Alabama's citizens have profited and will continue to profit from this litigation. So prevalent are mental disorders in our society that no family is immune from their perilous incursion. Consequently, the availability of institutions capable of dealing successfully with such disorders is essential and, of course, in the best interest of all Alabamians.

■ Despite plaintiffs' having benefitted so many people, however, they neither sought nor recovered any damages. Nevertheless, the expenses they incurred in vindicating the public good were considerable. To burden only plaintiffs with these costs not only is unfair but also is legally impermissible. See e. g., Mills v. Electro Auto-Lite Co., supra; Lee v. Southern Home Sites, supra. Considerations of equity require that those who profit share the expense. In this case, the most logical way to spread the burden among those benefitted is to grant attorneys' fees. Plaintiffs clearly are entitled to a reasonable award.

■ This Court must consider, therefore, what is reasonable under the circumstances. Factors relevant to the Court's determination generally are the same as those covering grants of attorneys' fees in commercial cases. See Bradley v. School Bd. of Richmond, supra. They include the intricacy of the case and the difficulty of proof, the time reasonably expended in the preparation and trial of the case, the degree of competence displayed by the attorneys seeking compensation and the measure of success achieved by these attorneys. In public interest cases, courts also should consider the benefit inuring to the public, the personal hardships that bringing this kind of litigation causes plaintiffs and their lawyers, and the added responsibility of representing a class rather than only individual plaintiffs.

Having considered these factors, the Court notes that the several aspects of the present litigation have synthesized to compose a very complex case. Plaintiffs' attorneys have navigated through a heretofore uncharted course and, in the process, have helped establish minimum constitutional standards for mental health institutions. These attorneys have exhibited professional conscientiousness throughout the litigation, and their toil, along with that of others, has culminated in an incalculable benefit to the people of Alabama.[3]

3. The able and invaluable assistance which plaintiffs' attorneys received from amici in this case in no way detracts from the quality of their effort. The Court is constrained, however, to comment generally on the number of lawyers for whom plaintiffs seek attorneys' fees. Because this case is so complex and the time required

The above considerations, and others, militate in favor of the Court's granting plaintiffs' attorneys full compensation. Nevertheless, the weight of these factors must be balanced against and tempered by the nature of this lawsuit. It is the duty of members of the legal profession to represent clients who are unable to pay for counsel and also to bring suits in the public interest. While lawyers who satisfy this ethical responsibility should be remunerated, their fees should not be exorbitant. This Court must bear in mind that the very goals plaintiffs' attorneys seek to achieve through litigation require great monetary outlays, most of which presently are unavailable. Some compromise, therefore, is essential.

In attempting to determine what is a reasonable fee under the circumstances, this Court is impressed with the philosophy underlying the Criminal Justice Act. That Act provides for compensation to attorneys appointed to represent indigent criminal defendants. The Act's legislative history makes clear that although the amount provided, $30 per in-court hour and $20 per out-of-court hour, is below normal levels of compensation in legal practice, it nevertheless is considered a reasonable basis upon which lawyers can carry out their professional responsibility without either personal profiteering or undue financial sacrifice. 1964 U.S.Code Cong. & Admin. News, p. 2997.

The Court is convinced that this philosophy applies with equal force to the present case. As already emphasized, lawyers participating in the case *sub judice*, as well as those participating in a Criminal Justice Act case, perform ethical and professional responsibilities. In both cases they embark upon their participation with knowledge that their named clients are unable to pay them. Generally, however, these lawyers are not motivated by desire for profit but by public spirit and sense of duty. Moreover, in both cases the rights involved, those dealing with restrictions on physical freedom, are of the most profound significance to the public. These similarities justify referral to the Criminal Justice Act.

■ On the basis of the fee schedule set forth in the Act, therefore, this Court has determined that a reasonable fee in this case is $30 per in-court hour and $20 per out-of-court hour.[4] In establishing this fee, however, the Court is careful to note that the Criminal Justice Act furnishes only a very flexible standard. In a particular case, a reasonable fee may vary either way from that provided by the Act.

In addition to determining an hourly fee, the Court is obliged to decide what time is reasonable for an attorney or attorneys to have spent in connection with the lawsuit. Plaintiffs' lawyers, Jack Drake and Reber Boult, have filed statements setting forth in detail their time expended in preparation of the case. The hours they have claimed are reasonable and uncontested. Plaintiffs' other lawyer, George Dean, however, has neglected to file a similar statement. Instead, he has testified only that he has spent almost all of 18 months working on the case. Under such circumstances, the Court must decide the amount of time an attorney should reasonably have spent to accomplish the work produced. From the evidence adduced at the hearing on this matter, the Court has made that determination.

Accordingly, it is the order, judgment and decree of this Court:

1. That attorney's fees and expenses of the Honorable George Dean in the amount of $23,600.00 be and the same

---

to meet various deadlines so great, the Court feels that the number of lawyers utilized by plaintiffs was necessary. In another case in which attorneys' fees are appropriate, the same may not be true. The Court must decide on an ad hoc basis whether the number of attorneys employ-

ed and the time expended by them were reasonable.

4. In addition to regularly employed legal staff, defendants retained special counsel in this case at a rate of $30 per hour.

are hereby taxed against defendant Alabama Mental Health Board;

2. That attorney's fees and expenses of the Honorable Jack Drake in the amount of $7,595.91 be and the same are hereby taxed against defendant Alabama Mental Health Board; and

3. That attorney's fees and expenses of the Honorable Reber Boult in the amount of $5,558.71 be and the same are hereby taxed against defendant Alabama Mental Health Board.

It is further ordered that defendant Alabama Mental Health Board pay said expenses and attorneys' fees to the Clerk of this Court within 30 days from this date. Upon receipt of these funds, the Clerk of this Court will deposit them in an interest bearing account. The Clerk of this Court is ordered and directed to hold said funds in said interest bearing account pending further order of this Court.