**KENTUCKY ASSOCIATION FOR RETARDED CITIZENS et al., Plaintiffs,**

**United States of America, Litigating Amicus Curiae,**

v.

**Peter CONN, Secretary, Kentucky Department for Human Resources, et al., Defendants,**

**Judith Anne Linton, David Brent Harralson, Intervening Defendants,**

**Charles W. Dobbins, Jr., Guardian ad litem.**

Civ. A. No. C 78–0157(A).

United States District Court,
W. D. Kentucky,
Louisville Division.

March 21, 1980.

Brian Lawlor, Henry Triplett, Louisville, Ky., Henry Hinton, Morehead, Ky., for plaintiffs.

Arthur E. Peabody, Jr., Leonard Rieser, Civil Rights Division, Dept. of Justice, Washington, D. C., Barry L. Master, Mikell Grafton, Asst. U. S. Attys., Louisville, Ky., for U. S. A.—litigating amicus curiae.

H. Hunter Durham, Columbia, Ky., for Clayton Lorenzen.

James A. Shuffett, Lexington, Ky., for Lorenzen & Excepticon.

Charles Wickliffe, Frankfort, Ky., for Comm. of Ky.

Martin Z. Kasdan, Jr., Frankfort, Ky., for State Defendants.

Joseph H. Terry, Madisonville, Ky., for Intervening Defendants.

David Vandercoy, St. Louis, Mo., for Nat'l Juvenile Law Center.

Oliver H. Barber, Jr., Louisville, Ky., for Ky. Youth Advocate.

Sarah Barber, Louisville, Ky., for Nat'l Juvenile Center.

Charles W. Dobbins, Jr., Louisville, Ky., for guardian ad litem.

Ann T. Hunsaker, Frankfort, Ky., for State.

## JUDGMENT

ALLEN, Chief Judge.

This action, having been submitted to the Court for decision following a trial before the Court, without a jury, and the Court, having considered the papers on file, the testimony of the witnesses, the briefs of the parties, the amici curiae, the oral arguments of the parties, and one amicus curiae of the National Juvenile Law Center, Inc.,

and the Court, having filed its findings of fact, conclusions of law and memorandum opinion, and being fully advised in the premises,

IT IS ORDERED AND ADJUDGED as follows:

1. So much of plaintiffs' complaint as seeks to prevent construction of a new Outwood facility at Dawson Springs, Kentucky, for the mentally retarded is hereby dismissed with prejudice.

2. The defendants, their servants, agents, employees and persons acting in privity with them are hereby permanently enjoined from placing in the present Outwood facility or in the new facility which will be constructed at Outwood for the care of the mentally retarded any status offenders or persons convicted of criminal offenses.

3. The defendants, their servants, agents, employees and persons acting in privity with them are hereby enjoined from placing in the present Outwood or in the Outwood facility to be constructed any mentally retarded persons who are either mildly or moderately retarded for any period longer than 30 days.

4. The Court specifically declares that each resident at the present Outwood or each resident who will be confined at the new Outwood shall be considered to be involuntarily committed, with the exception of those adult individuals who have acted on their own and without the auspices of a guardian or committee in applying to and securing admission to the mental retardation residential treatment center. As to these persons who are considered to be voluntarily confined, it is declared that K.R.S. 202B.040 is not applicable and said persons are entitled to be discharged forthwith upon their application for discharge.

It is further declared that every resident who has been committed by a guardian or committee has the same right as do minors to seek relief from actions approved by their guardians or committees for or against admission and discharge.

It is further declared that as to those persons who have voluntarily admitted themselves to the mental retardation residential treatment center, they are entitled to all of the rights set out in K.R.S. Chapter 202B provided, however, that K.R.S. 202B.040 and 202B.060(9) are not applicable to them since they are entitled to immediate relief upon their own application.

It is further declared that each resident committed by the action of a guardian or committee is entitled to the rights set out in K.R.S. 202B.040 and 202B.060, to the least restrictive alternative mode of treatment and to release from the mental retardation residential treatment center, where a determination is made by the interdisciplinary team that he or she presents no immediate danger or immediate threat of danger to self or others, and where the least restrictive alternative mode of treatment is in a community living facility, and where there is in existence a community facility which can adequately treat and supervise the resident.

It is further declared that each involuntarily confined resident may have the same rights as those conferred upon minors who are residents to seek relief from actions approved by their guardians or committees for or against admission and discharge.

It is further declared that every mentally retarded resident now at Outwood, or who will be at the new Outwood, or who will be at the old Outwood pending construction of the new Outwood, is entitled to the rights set out in the minimum standards in 42 U.S.C. Sec. 6010(3)(A) and (B).

It is further declared that all mentally retarded residents now in the facilities at Outwood or who, in the future, will be at such facilities, or at the new Outwood shall have all of the rights specifically set out in K.R.S. 202B.060(1) through (8) and (10) through (13).

IT IS FURTHER ORDERED AND ADJUDGED that when an interdisciplinary team reaches the conclusion that a resident at the present Outwood or the new Outwood facility has the potential for placement in an alternative living arrangement

within two years, that such decision, along with a description of the requirements of the alternative for that resident, shall be conveyed forthwith to the Secretary of the Department for Human Resources.

IT IS FURTHER ORDERED AND ADJUDGED that the Secretary for Human Resources, upon receiving such communication, shall make inquiry as to what community living arrangement facilities are available for the placement of the resident and the distribution of beds which are available for use by mentally retarded persons, giving priority to those persons found by the interdisciplinary team to be capable of being cared for in such community arrangements.

IT IS FURTHER ORDERED AND ADJUDGED that Charles W. Dobbins, Jr. Guardian ad litem, present to the Court his request for a reasonable fee to be awarded him, together with a summary of the hours which he has expended in connection with this action; said request to be filed within 15 days after entry of this judgment.

IT IS FURTHER ORDERED AND ADJUDGED that counsel for plaintiffs shall, if they so desire, move the Court for attorneys' fees, said motion to be accompanied by a detailed summary of the time expended on this action, together with a description as to whether they are lawyers or paralegal, said memoranda to be filed 20 days thereafter.

IT IS FURTHER ORDERED AND ADJUDGED that the parties to this action, with the exception of the United States, shall bear the costs of this action equally.

This is not a final and appealable judgment.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

This action is submitted to the Court for a decision following a non-jury trial which lasted some 31 days, and which resulted in more than 5,000 pages of testimony, together with numerous depositions and hundreds of exhibits.

The complaint was filed on May 16, 1977 by the Kentucky Association for Retarded Citizens, hereinafter KARC, and six retarded current and former residents of Outwood and their parents or guardians. A class action order was entered by the Court allowing the plaintiffs to represent all persons who presently reside or may, in the future, reside at Outwood. Outwood is a 300 bed residential facility for retarded persons, located in a rural setting a few miles from Dawson Springs, Kentucky, a city of approximately 3,000. Outwood is operated by defendant Excepticon, Inc., a private corporation under contract with the defendant Department for Human Resources of the Commonwealth of Kentucky. Defendant Peter Conn is the Secretary of the Department for Human Resources, and the other defendants are William P. McElwain, Commissioner, Kentucky Bureau for Health Services; Jack C. Lewis, Commissioner, Kentucky Bureau for Social Services; the Director, Kentucky Division for Mental Health and Mental Retardation Services; Russell McClure, Commissioner, Kentucky Executive Department for Finance and Administration; Clayton Lorenzen, Facility Director, Excepticon-Outwood Campus; Excepticon, Inc., a Kentucky Corporation; Maxine Pulliam, Guardianship Officer, Kentucky Department for Human Resources.

In addition, the parents of Outwood residents Judith Anne Linton and David Brent Harralson have intervened on behalf of their children in favor of an institution such as Outwood. The United States of America has intervened, litigating amicus curiae, and has allied itself with the plaintiffs. Charles W. Dobbins, Jr. has been appointed Guardian ad litem, to protect the interest of the class.

The plaintiffs' action alleges violations by the defendants of constitutional and statutory rights of the class represented by the plaintiffs. The action seeks to prevent the defendants from constructing a new facility at Outwood which would accommodate 175 mentally retarded citizens in 16 cottage-like residences.

Outwood has been the subject of many visits by witnesses of all parties, as well as the Guardian ad litem, Charles W. Dobbins, Jr., who has been there on two occasions, the latter of which was on October 22, 1979 in the company of Dr. Joy Donaldson, Mr. Jerry Griepentrog, and the Court.

Outwood was originally constructed in 1922 for the treatment of victims of respiratory illnesses, primarily tuberculosis. In 1962, it was turned over to the State of Kentucky and used by it as a facility for the mentally retarded until 1975, when it entered into a contract with Excepticon, Inc. to operate the facility for a fixed fee. That fee was $4,951,840 for the year ending January 31, 1979, paid in quarterly installments with provisions for a return to the State of Kentucky of substantially all of any profits in excess of 10% of the contract amount.

The new facility envisioned by the defendants would cost in excess of $8,000,000 to build and would be located virtually in the same place as the present one. All of the witnesses agree that the new facility will be a great physical improvement over the present one which has been described as "atrocious" by witnesses for all of the parties.

Plaintiffs contend that construction of the new facility, as opposed to development of community alternatives, is in violation of 29 U.S.C. Sec. 794 and 42 U.S.C. Sec. 6010, et seq., as well as K.R.S. Chapters 202A and 210, under a claim of right to treatment, right to the least restrictive alternative, and right to freedom from harm. Plaintiffs also claim violation of the Fourteenth Amendment by denial of the rights to treatment and the least restrictive alternative, right to freedom from harm, and denial of equal protection, and violation of the Eighth Amendment's right to freedom from harm.

Defendants generally maintain that many of these claims have no legal standing in this Court and further that even if the amendments to the Constitution and statutes cited by plaintiff are applicable, that there has been no violation of their rights.

There are now approximately 266 residents at Outwood, of whom 54% are profoundly retarded, 33% are severely retarded, 12% are moderately retarded, and 1% are mildly retarded. The American Association on Mental Deficiency classes the profoundly retarded as having an I.Q. of 0 to 19, the severely retarded as having an I.Q. level of 20–35, the moderately retarded as having an I.Q. level of 36–51, and the mildly retarded as having an I.Q. level of 52–67.

Defendants contend that a profoundly retarded person can function only at a level equivalent to a 2 to 12 month old child, and that a severely retarded person can function at a level of a normal child between the ages of 12 months and three years. Plaintiffs take the position that, although profoundly retarded persons may never be completely independent, they are entitled to reside in group community homes or other facilities which are not of an institutional nature, and that it is in these facilities, as opposed to institutions, that the maximum potential of the person can be realized.

The record is replete with statements by plaintiffs' witnesses praising the group home concept and denouncing the institutional concept. These witnesses point to the advances being made in states such as New York, Massachusetts, Nebraska, Kansas, and Pennsylvania where many mentally retarded persons are being deinstitutionalized, either as a result of a consent decree, or as a result of a change in the philosophy of the state in question.

The defendants contend that, although it is desirable for the mentally retarded to be placed in that environment which is the most home-like that can be afforded, that there do not exist in Kentucky sufficient group homes and facilities to take care of the mentally retarded who could utilize them. They further argue that it will always be desirable to have centrally located regional facilities which offer all types of services that are needed by the mentally retarded and which will act as learning centers for those engaged in the treatment and care of the mentally retarded.

Although the witnesses for the plaintiffs were almost unanimous in their opinion that the severely and profoundly retarded persons could be placed in community settings, such as group homes, and although the trend nationally is toward such development, all of them conceded that in each of the states where they resided institutional facilities were still in use, and that in the great majority of instances, such institutions were much larger than the proposed new Outwood. It also seems to be the consensus of opinion of all the witnesses that it is inappropriate to deinstitutionalize mentally retarded residents until all of the necessary support services, group homes and other residential facilities have been provided in the communities to which the individuals are to be released.

Broadly stated, the plaintiffs' position seems to be that it is the duty of the State to provide all of the group homes and other residential facilities, and the support services in all of the communities where mentally retarded persons would be expected to live. Plaintiffs believe that it would be a waste of funds to expend the eight million or more dollars which would be required to build the new Outwood when such funds could be diverted to provide residential care facilities.

Plaintiffs proposed some 397 findings of fact. Defendants took issue with a great many of these proposed findings. At this stage of the opinion, it should be observed generally that plaintiffs' complaints cover almost the complete range of services provided by Outwood. Plaintiffs introduced witnesses for the purpose of showing that Outwood has failed to provide a minimal opportunity for habilitative care of its residents, that it has been plagued with staff shortages, high turnover, inadequate and insufficient employee training programs which have harmed the residents, that it has abused the residents and injured some of them, and has failed to provide adequate programs to stimulate the potential of the residents. Broad sweeping statements are made that the psychological and social services, the occupational therapy services, the speech services, dietary services, therapeutic recreation services, physical therapy services, and medical, drug and nursing services at Outwood are inadequate.

Plaintiffs contend further that the Outwood residents are involuntarily confined and are denied meaningful participation in the activities of community life. Plaintiffs also argue that even though the proposed 176-bed facility with its 11 homelike cottages, each containing 16 residents, would be a great physical improvement over the present facilities, there is no need for the proposed facility and that all of the services which it would provide can be provided in the community.

The contention has been made that there is no showing that Outwood will provide the least restrictive alternative for persons proposed to be placed there, and that the New Directions program formulated in 1979 by the State does not show a need for the new Outwood, nor assure access to community placements for inappropriately institutionalized residents, and precludes certain retarded persons from placement in community settings solely on the basis of their handicap. The argument is further made that federal funds are available to finance services in the community and that these services will cost less than a new Outwood and the services to be provided there.

The further argument is made that Outwood is segregated and isolated, and that by reason of its location, there have been chronic shortages in staff, a lack of effective community assimilation, and that the decision to build the new Outwood is inconsistent with recommendations that the old facility be closed and be replaced. Plaintiffs also contend that there are numerous reports of Kentucky executive and legislative branches, as well as the Department for Human Resources, which recognize that the normalization principle mandates the development of community-based residential services for retarded persons.

The evidence produced by the parties on a great many of the issues raised by the plaintiffs was sharply conflicting. For example, there were parents who testified

that they believed that Outwood was not a desirable place to keep their mentally retarded children, while there were other parents who testified that Outwood was a desirable place to maintain their mentally retarded children. Those testifying parents who had withdrawn their children from Outwood had placed them in institutions such as Cedar Lake Lodge, a 60-bed facility operated by a religious organization; that particular institution is far more updated and pleasing in its physical appearance than the present Outwood, and is constructed using the cottage arrangement proposed for the new Outwood. These parents had not placed their children in group homes, according to their testimony, because no such facility was available, and it was not possible for the children to return home to live with their parents.

When the evidence is fairly weighed and the credibility of the witnesses duly assessed, the following findings seem appropriate:

Plaintiffs failed to show any physical abuse of any Outwood resident with one exception which occurred in 1969.

Plaintiffs failed to show that excessive use of restraints is now occurring, although prior to the basic upgrading which took place at Outwood in 1977, and which followed the filing of this suit and the promulgation of state and federal regulations, restraints were excessively used and at times without adequate reasons. Prior to the filing of this suit and the promulgation of the regulations, there is little doubt that most of the rooms of the residents were bleak and sterile, and that little or no consideration had been given to providing a cheerful environment for the residents. That situation has been drastically changed, and probably the filing of this lawsuit, combined with the promulgation of the regulations, prompted Excepticon to purchase draperies and chairs, cabinets for the use of residents in placing their personal belongings, partitions for showers and toilets, and other physical improvements which otherwise would not have been made.

Plaintiffs produced as a witness Dr. Sprague, whose testimony was to the effect that a large percentage of the residents were receiving more than one psychotropic drug, a practice identified as polypharmacy. He also testified that drugs were being prescribed on a p. r. n. (as needed) basis, and that this was a dangerous practice. He also complained about the use of intramuscular injections of drugs, and that adequate training had not been offered to direct care staff as to the side-effects of psychotropics and neuroleptics.

The defendants produced evidence by Dr. Mason and Dr. Ruth, and after weighing the testimony of these witnesses and that of Dr. Sprague, the Court finds that as of the date of Dr. Ruth's testimony in 1979, only 7 out of 269 residents were receiving more than one psychotropic drug on a daily basis. The Court further finds that the use of intramuscular injections on a p. r. n. basis is not injurious to the residents where the need is medically identified and documented, and the circumstances under which the medication may be so administered are clearly described in the resident's record; the evidence showed that there was a limited use of such administrations.

The Court also finds that Dr. Sprague's testimony that excessive dosages of drugs were prescribed in the recent past is not convincing, and that the only proven instance of excessive drug dosage was that of a resident who was receiving 1,000 units of mellaril daily. The defects which existed in 1975 have been largely, if not entirely, remedied by a better system of record-keeping, by more intensive training given to staff regarding the use of psychotropic drugs, and more importantly by the diminution in the use of psychotropic drugs.

It should also be observed that plaintiffs' attempt to prove that the deaths of Robert E. and Lawrence L. were caused by defendants was not sustained by the preponderance of the evidence. In the case of Robert E., the evidence shows that death occurred as a result of aspiration of food, and this accident occurred despite the fact that the resident was under close supervision in a

feeding program at the time, and received immediate medical attention when the choking was observed. In the case of Lawrence L., plaintiffs attempted to show that death, immediately resulting from bilateral aspiration, was produced by an overdose of Sparine, administered intramuscularly pursuant to a p. r. n. order. The most that the evidence shows is that it is possible for extremely large doses of Sparine to suppress the cough reflex. This falls far short of proving that Sparine produced the tragic death of this resident.

In the area of adaptive equipment for mentally retarded residents who suffer orthopedic problems, it was shown that Excepticon was delinquent in providing the needed equipment promptly, but that it did, after a six months delay, secure such equipment for those of its residents who were in need of it. There was little evidence which showed any substantial harm was done to any of the residents who had need of this orthopedic equipment, although it is obvious that such harm could result if the equipment were not available over long periods of time.

With regard to the question of whether residents are progressing or regressing, the evidence is quite conflicting. There was evidence that some residents' records reflect fewer skills now than at the time of their admissions. There was also testimony from some parents that their children can readily perform at home tasks which are still part of their allegedly unattained objectives at Outwood. On the other hand, there is substantial evidence of improvement on the part of some of the residents. As may be expected, the acquisition of learning skills and improvements in that field can be painfully slow. For example, in the past four years, Outwood has discharged only 77 of its residents; of these, 24 were released back to their own families, 20 to nursing or personal care homes, 17 to other ICF/MR facilities, and only 14 to group homes or other community placement. On the other hand, Excepticon contends that only 87 of the 269 persons presently residing at Outwood are expected to become residents of the new facility.

Prior to this lawsuit, interdisciplinary team assessments of the residents were not conducted on a systematic basis, and the plans for the treatment and training of the mentally retarded were vague and not in keeping with high standards of care. Since the filing of the lawsuit and the promulgation of state and federal regulations, interdisciplinary assessment is made of each resident at least annually. The parents of the resident, as well as the resident himself, are invited to this periodic review session. Comments and suggestions are made by each member of the team and recommendations are made for changes in the resident care plan. The periodic review includes a statement of potential for alternative placement.

The evidence shows that Excepticon has plans to employ 364 persons. As of January 1, 1979, there were 12 positions which were unfilled:

One full-time psychologist; two licensed practical nurses; one program director; one cottage supervisor; two social workers; one physical therapist; and three direct care aides.

Of the 364 positions maintained by Excepticon, 88 are executive and administrative, food service, maintenance, and other non-direct care duties. The remaining 276 positions which are much more directly connected with the care of the residents are divided into 34 categories. In terms of numbers, the most significant positions are direct care aides, with 127 potential employees; institutional aides with 24 employees; health care aides with 22 employees; licensed practical nurses with 16 employees; medical technicians numbering 13; workshop aides and a position designated as "Ad Act" numbering 12. Another position to be noted is that of registered nurses, of whom there are 6; cottage supervisors numbering 7; social workers numbering 3; and unit directors numbering 3.

In addition, there are provisions for one or more physical therapists, laboratory technicians, a pharmacist, an x-ray consultant, a dental consultant, occupational and speech

therapists, a psychologist, chaplains, a dietician, and a pre-sheltered vocational director.

Defendants do not dispute that Outwood has suffered staff turnovers as high as 88% to 100% per year, but point out that bare statistics reveal little concerning the actual staff composition, since the same position may have turned over more than once in a year. More significantly, both defendants' and plaintiffs' witnesses testified that staff "burnout" and accompanying staff turnover are problems inherent in work with the mentally retarded, and can be observed in group homes and deinstitutionalized arrangements as well as in institutions.

Outwood has been without a full-time physical therapist since April, 1978, but has employed a full-time speech therapist and a psychologist. It is true that these employees, prior to their employment at Outwood, had had no experience in working with the mentally retarded. The psychologist was to become Board Certified in March, 1979.

During the course of the trial, and in their briefs, plaintiffs have pointed out that the ratio of staff to residents at Outwood did not in many areas meet the standards imposed by former District Judge Frank Johnson, now Circuit Judge on the United States Court of Appeals for the Fifth Circuit, in *Wyatt v. Stickney*, 344 F.Supp. 387 (W.D.Ala.1972). Also, plaintiffs compared the ratio of staff at Outwood to that of the staff at the Pennhurst facility in Pennsylvania, which was the subject of a sweeping decree entered by District Judge Broderick in the case of *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295 (E.D.Pa.1977), aff'd. in part and rev'd. in part by the United States Court of Appeals for the Third Circuit, sitting *en banc*, 612 F.2d 84 (1979).

District Judge Broderick, in his opinion, compared the staffing at Pennhurst with the *Wyatt v. Stickney, supra*, standards, and in so doing, stated at p. 1303:

"None of the standard reference sources now generally used by professionals in the field of mental retardation define the qualifications and minimal numbers of mental retardation professionals necessary to provide minimally adequate programs of habilitation."

However, the court in *Wyatt v. Stickney, supra*, attempted to provide such guidelines.

One further comment should be made in this area: Judge Johnson was faced with appalling conditions which existed at the Partlow State School and Hospital in Tuscaloosa, Alabama at the time when he made his decision. Faced with these conditions, which required drastic action, Judge Johnson rightfully took such action and imposed upon the Alabama authorities very strict standards with regard to the ratio of staff to residents. Since that time, it is the understanding of this Court that hearings have been held to determine whether the remedies prescribed by Judge Johnson originally should still be maintained, or whether there should be some relaxation of those very high standards which he set. That question has not been resolved.

This Court sits in a different circuit than did the *Wyatt v. Stickney, supra*, court and the *Halderman v. Pennhurst, supra*, court. These standards of ratio of staff to residents are, therefore, not binding on this Court. If the ratios of staff to residents accepted by Excepticon are adequate to meet the standards imposed by the licensing authorities, and there is no clear evidence that they do not meet these standards, then the ratios are within legal limits, unless plaintiffs can show that severe abuses have resulted as a result of failure to meet the *Wyatt* and *Halderman* ratios. The Court does not believe that plaintiffs have met this burden of proof.

Plaintiffs have shown that the average stay of the resident in Outwood is 9.9 years. Plaintiffs have shown that, although the State of Kentucky is now committed on paper to a program of placing mentally retarded persons in the least restrictive environment, and to putting them into group homes and community settings, the performance by the State has not yet matched the promise. It also appears that the State has made its plans to construct the new facility without first determining on an in-

dividualized basis whether the needs of those persons who are now institutionalized would best be served by community placement or the building of a new facility.

One of the arguments made by the plaintiffs is that the eight million dollars or more which will be spent by the State in constructing the new facilities could be much better expended by providing community and group settings for mentally retarded persons. When one examines the cost of the new facilities, and the provisions made by the State for community facilities, the former cost dwarfs the expenditures to be made for the community facilities.

Plaintiffs and defendants produced witnesses who testified in general rather than specific terms regarding the relative costs of rendering necessary services to the mentally retarded person in a community living arrangement versus an institution. The testimony was conflicting, it was not based on any factors identifiable in Kentucky's specific situation, and while we are inclined to believe that costs would be irrelevant in any event, we must conclude that the testimony produced herein was not probative of any issue even arguably before us. This argument is basically one which, under ordinary circumstances, would be addressed to the Legislature and to the Department for Human Resources, and other parties charged with drafting and executing Kentucky's mental retardation laws.

Plaintiffs contend, however, that Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, prohibits the State from building a new institution and from choosing between institutions and placement in a community setting. This argument will be addressed first before considering the other statutory and constitutional claims of the plaintiffs.

Title 29 U.S.C. Sec. 794 provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."

There is no question that mentally retarded persons are handicapped individuals within the meaning of the Act. See *Halderman v. Pennhurst, supra,* at p. 1323. Also, the State of Kentucky receives funds from the Federal Government which are used in the treatment of the mentally retarded of Kentucky and which are used to meet Kentucky's contractual obligation to Excepticon. Therefore, the statute is applicable to the mentally retarded residents located at Outwood. The question still remains as to whether the statute, either by clear implication or because of congressional language which preceded its passage, was meant to prohibit the states from institutionalizing the mentally retarded, or from providing facilities where mentally retarded persons could be housed.

It is clear that the statute on its face contains no reference to the building of new facilities for mentally retarded persons or any other handicapped persons. However, Judge Broderick, in holding that the statute had been violated in *Halderman, supra,* relied upon a statement made by Senator Hubert Humphrey on January 20, 1972, where the Senator called attention to three-fourths of this country's institutionalized mentally retarded, who lived in facilities which were more than fifty years old, functionally inadequate and designed simply to isolate those persons from society. Senator Humphrey stated that these people have the right to live and to work to the best of their abilities but that they are too often kept out of our schools and community activities altogether because they are regarded as different or a disturbing influence. After asking what the cost-effectiveness was in consigning them to terminal care in an institution, he stated "(T)hese are people who can and must be helped to help themselves." He went on to state that this was their constitutional right. See 118 Cong. Rec. 525 (1972) and *Halderman v. Pennhurst State School & Hospital, supra,* at p. 1323.

Judge Broderick, after discussing this eloquent statement by Senator Humphrey,

went on to find that Section 504 confers a private right of action and imposes affirmative obligations on state and local governmental authorities, and that "under Section 504 unnecessarily separate and minimally inadequate services are discriminatory and unlawful," citing *Lloyd v. Regional Transportation Authorities*, 548 F.2d 1277 (7th Cir. 1977); *Barnes v. Converse College*, 436 F.Supp. 635 (D.S.C.1977); *Gurmankin v. Costanzo*, 411 F.Supp. 982 (E.D.Pa.1976), aff'd, 556 F.2d 184 (3rd Cir. 1977); 42 Fed. Reg. 22687 (1977); cf. *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

At the time that Judge Broderick decided *Halderman, supra,* he did not have the benefit of the Supreme Court decision in the case of *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In that case the Supreme Court, for the first time interpreted the Rehabilitation Act and specifically Section 504 of that Act. In that case, a woman who wished to become a nurse but who suffered severe hearing problems was denied admission to the Nurses' Training School operated by the petitioner. The district court affirmed the decision of the college not to admit the respondent, but the Circuit Court of Appeals reversed and held that there was an affirmative obligation upon the part of the college to provide a program whereby the nurses' hearing handicaps could be minimized, and she could be trained to become a registered nurse. The Supreme Court reversed the appellate court decision and held that Section 504 of the Act does not impose an obligation upon an institution receiving federal funds to provide an affirmative action program for a person who is handicapped.

The language of Section 504 seems to this Court to be rather clear and straightforward. Its meaning is that a person who is qualified to perform a task or to enter an educational institution or to receive the benefits of any program or activity which receives federal financial assistance shall not be denied the right to work or to receive the benefits because he or she has a handicap. For example, an individual who is blind may not be denied the right to work

in a facility that receives federal assistance if he is otherwise qualified to do the work. The handicap may not be used as an excuse to bar an individual from benefits of federal assistance, if the individual is otherwise qualified.

The *en banc* opinion of the United States Court of Appeals for the Third Circuit in *Halderman v. Pennhurst, supra,* of which 67 pages consisted of the majority opinion and 31 pages the dissenting opinion by Chief Judge Seitz (with whom Judges Aldisert and Hunter joined) approved nearly all of the actions taken by District Judge Broderick, but refused to rule upon the question of whether Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. sec. 794 (1976) reflected the Congressional desire to discourage the institutionalization of the mentally handicapped. Instead the court based its decision on two basic grounds: The first was the premise that the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. Secs. 6001–6081 (1976) provided the right to treatment in the least restrictive alternatives for the mentally retarded, and further that it created a presumption that the least restrictive alternative for the mentally retarded is in community living facilities and not in institutions. The second premise was that Pennsylvania's Mental Health and Mental Retardation Act of 1966, Pa.Stat.Ann.Tit. 50 Secs. 4101–4704 (Purdon 1969), creates for retarded persons an affirmative right to minimally adequate habilitation.

■ While the majority opinion did not discuss or rule upon the meaning of the Rehabilitation Act of 1973, the dissenting opinion did, and correctly, in this Court's mind, reached the conclusion that Section 504 of that Act does not include a legislative mandate for deinstitutionalization. See the dissenting opinion, page 120. As the dissent points out, the purpose of the Rehabilitation Act was to prevent a state from discriminating against the participation of an otherwise qualified handicapped individual in any program or activity receiving federal aid, and also to prevent the

states from denying such an individual the benefits of or subjecting him to any discrimination under a federally assisted program.

We must now consider the question, although it was barely raised by the plaintiffs initially, as to whether or not the Developmentally Disabled Act, hereinafter referred to as the DDA, constitutes a prohibition against the expenditure of state funds and federal funds for a new facility for the mentally retarded. The key section to the understanding of the bill is the so-called "Bill of Rights" section, 42 U.S.C. Sec. 6010. That section is as follows:

"Congressional findings respecting rights of developmentally disabled

"Congress makes the following findings respecting the right of persons with developmental disabilities:

(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institution or other residential program for persons with developmental disabilities that—

(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons; or

(B) does not meet the following minimum standards:

(i) Provision of a nourishing, well-balanced daily diet to the persons with developmental disabilities being served by the program.

(ii) Provision to such persons of appropriate and sufficient medical and dental services.

(iii) Prohibition of the use of physical restraint on such persons unless absolutely necessary and prohibition of the use of such restraint as a punishment or as a substitute for a habilitation program.

(iv) Prohibition on the excessive use of chemical restraints on such persons and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment, or habilitation for such persons.

(v) Permission for close relatives of such persons to visit them at reasonable hours without prior notice.

(vi) Compliance with adequate fire and safety standards as may be promulgated by the Secretary.

(4) All programs for persons with developmental disabilities should meet standards which are designed to assure the most favorable possible outcome for those served, and—

(A) in the case of residential programs serving persons in need of comprehensive health-related, habilitative, or rehabilitative services, which are at least equivalent to those standards applicable to intermediate care facilities for the mentally retarded promulgated in regulations of the Secretary on January 17, 1974 (39 Fed.Reg. pt. II), as appropriate when taking into account the size of the institutions and the service delivery arrangements of the facilities of the programs.

(B) in the case of other residential programs for persons with the developmental disabilities, which assure that care is appropriate to the needs of the persons being served by such programs, assure that the persons admitted to facilities of such programs are persons whose needs can be met through services provided by such facilities, and assure that the facilities under such programs provide for the humane care of the residents of the facilities, are sanitary, and protect their rights; and

(C) in the case of nonresidential programs, which assure the care provided by such programs is appropriate to the persons served by the programs."

The following observations are pertinent:

Congress, in enacting 42 U.S.C. Sec. 6010(1) and (2), seemed to be explicit in its finding that persons with developmental disabilities have a right to appropriate treatment and habilitation for those disabilities, and that the treatment and habilitation should be designed to maximize the developmental potential of the person in the setting that is least restrictive of his personal living. However, 42 U.S.C. Sec. 6010(3) qualifies or makes more specific the obligations of the federal government and the state, and, in essence, requires them to make certain that public funds do not flow to any institution or other residential program for the mentally retarded that either does not provide treatment and habilitation appropriate to the needs of such persons, or does not meet six specific minimum standards.

When paragraphs (1), (2) and (3) of 42 U.S.C. Sec. 6010 are fully examined, it seems fair to state that Congress contemplated that institutional as well as residential programs for the handicapped would continue to be provided, and, further, that the programs which are provided must either provide appropriate treatment and habilitation or meet the six standards referred to in paragraphs (3)(B)(i) through (vi).

Read in this manner, it is far from apparent that Congress was mandating the discontinuance of institutional programs. On the contrary, it would seem that Congress realized that there might even be situations where a developmentally disabled person would not have to be furnished treatment and habilitation as such, but would have to be provided with custodial care according to minimum standards such as proper diet, appropriate medical services, proper safety compliance, and prohibition of the use of physical restraint.

This Court must respectfully disagree with the holding of the majority in *Halderman v. Pennhurst, supra,* with reference to the DDA. As Chief Judge Seitz points out at page 119, the legislative history of the 1975 amendments to the Act show a clear preference for deinstitutionalization. The amendments increased the authorization of appropriations for this purpose, and the House Report stated that the Committee hoped that State and other funds being spent on institutional care would be rebudgeted for community care, which had not always occurred. However, the House Conference Report reflects that the Committee chose to include a requirement that the State plan contain a plan to eliminate *inappropriate* institutionalization while improving the quality of care and surroundings for persons for whom institutional care is appropriate, and specifically rejected a Senate proposal to require a specific goal-oriented plan for deinstitutionalization. 1975 U.S.Code Cong. and Admin.News 919, 953.

This Court believes that while Congress hoped for an approach by the states which would prefer community treatment to institutional treatment, there is no section in the DDA which mandates deinstitutionalization *per se.* Congress still left it to the states to decide the proper allocation of funds and did not authorize federal courts to dictate how those funds were to be spent by the states.

It is of some significance that the DDA was passed in 1975, after the decision of the Supreme Court in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). In that case, the Supreme Court specifically refused to pass upon the question of whether a mentally disabled person has a right to treatment when he is placed in a state institution against his will. The court avoided the issue by holding that the only issue was whether plaintiff had been deprived of his liberty without just cause. The court, therefore, refused to endorse any right to treatment theory, even though that right has been endorsed by many district and appellate courts. See *Wyatt v. Stickney, supra,* (aff'd. in part, remanded in part, reversed in part); *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn.1974) aff'd in part and vacated and remanded in part, 550 F.2d 1122 (8th Cir. 1977); *Gary W. v. Louisiana,* 437 F.Supp. 1209, 1217–19 (E.D.La.1976).

■ By way of summary, the Court holds that defendants have at least met the minimum standards prescribed in 42 U.S.C. Sec. 6010(3)(B)(i) through (vi), despite the fact that deficiencies may have existed with regard to excessive use of physical restraints and excessive use of chemical restraints prior to the implementation of the program of care which now exists at Outwood under the leadership of Excepticon. Whether these improvements have been due to the institution of the lawsuit or to Excepticon's management or the promulgation of federal and state regulations or to all of these factors cannot be determined precisely, but suffice it to say that the Court is satisfied that at least the minimum standards set out in the DDA are being met.

■ Although the D.D.A. does not prohibit the construction of a new Outwood intended to house the profoundly and severely retarded, language contained in the Act, to wit: 42 U.S.C. Sec. 6010(3)(B)(iii) by implication bans the contemplated placement of 32 mentally retarded offenders. That provision of the statute prohibits the use of physical restraint on mentally retarded persons unless absolutely necessary, and the prohibition of restraints as punishment or a substitute for a habilitation program. The conclusion cannot be escaped that if mentally retarded persons who have been convicted of offenses are placed in the new Outwood, security measures involving the use of personnel who will partake somewhat of the character of prison guards will be necessary and probably other measures such as the locking of doors and facilities, as well as the possible use of barred windows may become necessary.

It is contemplated that these offenders, although living in separate cottages from other residents, would be in training modules, at parties for the residents, and quite possibly in vocational training, and the workshop, as well as participating in trips to the community. It would seem that the presence of mentally retarded offenders on the campus would greatly contribute to an atmosphere which was more in keeping with a penal institution than with a residential treatment center for the mentally retarded.

Also, it should be noted that the conditions that would probably be created by the treatment of mentally retarded offenders at the new Outwood would not be in accord with the findings made by Congress that treatment and habilitation for a mentally retarded person should be provided in a setting that is less restrictive of that person's personal liberty. While, as noted before, that finding is not binding upon the State, when it is considered in connection with the minimum standard pertaining to the use of physical restraint, it is sufficient to warrant the conclusion that the State should not house the mentally retarded offenders in a residential treatment facility.

This conclusion is not reached without some reluctance, since the Court is aware of the dangers implicit in placing a mentally retarded person in a prison or penitentiary. To do so would subject him or her to almost certain abuse at the hands of his or her fellow inmates. Certainly the State can make better provision for this class of persons than to resort to the alternative of a penitentiary or prison, and some type of group setting which is well secured should be the answer.

■ Even if the D.D.A. is not applicable to mentally retarded offenders and does not prohibit their housing at a residential treatment center such as the new Outwood, there is no doubt that 42 U.S.C. Sec. 5633 prohibits the placement of status offenders who are mentally retarded at such a facility. The applicable portions of that statute are as follows:

"(a) In order to receive formula grants under this part, a State shall submit a plan for carrying out its purposes consistent with the provisions of section 3733(a)(1), (3), (5), (6), (8), (10), (11), (12), (15), and (17) of this title. In accordance with regulations established under this subchapter, such plan must—

. . . . .

"(12)(A) provide within three years after submission of the initial plan that juve-

niles who are charged with or who have committed offenses that would not be criminal if committed by an adult, or such nonoffenders as dependent or neglected children, shall not be placed in juvenile detention or correctional facilities; and

(B) provide that the State shall submit annual reports to the Associate Administrator containing a review of the progress made by the State to achieve the deinstitutionalization of juveniles described in subparagraph (A) and a review of the progress made by the State to provide that such juveniles, if placed in facilities, are placed in facilities which (i) are the least restrictive alternatives appropriate to the needs of the child and the community; (ii) are in reasonable proximity to the family and the home communities of such juveniles; and (iii) provide the services described in section 5603(1) of this title;

"(13) provide that juveniles alleged to be or found to be delinquent and youths within the purview of paragraph (12) shall not be detained or confined in any institution in which they have regular contact with adult persons incarcerated because they have been convicted of a crime or are awaiting trial on criminal charges;"

It is established by the evidence that the Commonwealth of Kentucky has been receiving funds from the United States under the Juvenile Justice Program and under the terms of 42 U.S.C. Sec. 5633 for more than three years and, therefore, the statute is applicable and is an absolute bar to the placement of status offenders at the new Outwood.

We now address the question of whether or not state law forbids the construction of the new Outwood, and if it does not, what are the rights of those persons who will be residents of the new Outwood, or who are now residents of the present Outwood.

K.R.S. 202B, effective June 17, 1976, is in effect a statutory bill of rights for the mentally retarded. K.R.S. 202B.060 is entitled "Rights of mentally retarded; secretary to adopt regulations." That statute goes on to provide, in substance, that the Secretary of Human Resources shall adopt rules and regulations for the proper administration and enforcement of Chapter 202B, which rules and regulations shall include but not be limited to the rights of mentally retarded residents in thirteen different areas.

K.R.S. 202B.010 defines a resident as a person under care or treatment in a mental retardation residential treatment center, and since that term means a residential treatment facility approved by the Department for the evaluation, care and treatment of mentally retarded persons, and since the new Outwood is approved by the Secretary of Human Resources for such problems, and since there is no prohibition in the statute against the construction of new facilities, the Court must conclude that Kentucky has not banned the construction of new facilities for the treatment and care of mentally retarded persons. On the other hand, Kentucky is very concerned, as evidenced by K.R.S. Chapter 202B, with the rights of those mentally retarded persons who are confined in mental retardation treatment centers such as the present Outwood or the new Outwood.

Insofar as the rights of the mentally retarded residents who are at the present facility and who would be at the new Outwood are concerned, an analysis of K.R.S. 202B.040 combined with 202B.060 reveals the intention of the Legislature to provide the least restrictive alternative mode of treatment for the mentally retarded.

In reaching this conclusion, the Court notes first that K.R.S. 202B.040 explicitly provides that before any person who is mentally retarded may be involuntarily committed, there must be a determination that he is a mentally retarded person and that he presents an immediate danger or an immediate threat of danger to himself or others, and that the least restrictive alternative mode of treatment requires placement in a hospital or a mental retardation residential treatment center, hereinafter M.R.R.T.C., and that treatment which can reasonably benefit him is available in the hospital or M.R.R.T.C.

K.R.S. 202B.060, after setting out in its first ten sections the requirement that the Secretary of Human Resources shall adopt rules for the proper enforcement of Chapter 202B, which shall include many rights of residents set out in 202B.060(1) through (11), then goes on to provide in subsection (12) for the release of residents to less restrictive alternative modes of treatment on convalescent status, and in subsection (13) requires the Secretary to make provisions for alternative methods of involuntary hospitalization.

While the language contained in K.R.S. 202B.060 tracks K.R.S. 202A.180, a statute which pertains to the rights of the mentally ill, that language plus the language contained in the following section for alternative methods for involuntary hospitalization, coupled with the sweeping language in K.R.S. 202B.040 as to the involuntary commitment, is ample evidence of the purpose of the Legislature to insure that mentally retarded persons who are involuntarily committed are not confined in an M.R.R.T.C. unless that is the least restrictive alternative mode of treatment. It would be incongruous, indeed, if a person could not be committed to an M.R.R.T.C. unless it was the least restrictive alternative mode of treatment, and then be confined there after it had developed that it was not the least restrictive alternative mode of treatment.

While the statutory scheme makes it clear that the involuntarily committed mentally retarded enjoy the right to the least restrictive mode of treatment, the question of who is involuntarily committed is not answered directly by the statutes. In the case at bar, it appears that there are three modes by which residents come to Outwood. The first is that it occurs when their guardian, usually a parent, determines to bring them to Outwood and placement has been made after approval by Excepticon. The second mode of commitment is that it occurs when an employee of the State, one Maxine Pulliam, is appointed as committee for a mentally retarded person and then makes application for his or her admission to Outwood, which is then approved by Excepticon. The third mode of admission is that it occurs when an adult mentally retarded person of his own volition requests admission to Outwood.

The evidence reveals that some 155 persons had been admitted to Outwood as a result of an application filed by defendant Maxine Pulliam. Four others were admitted as a result of an application by an adult mentally retarded person acting on his or her own behalf. The other 108, therefore, must have been admitted by applications filed by their guardians. The evidence did not show how many of the 155 who were committed under the auspices of Ms. Pulliam were committed by a court order. It should be observed that the evidence is not entirely clear as to the existing numerical composition of each of these classes of residents.

The defendants take the position that every resident at Outwood is voluntarily committed and has the right to seek his or her own discharge at any time, which right will be forthwith granted. This argument overlooks the obvious, to wit: the fact that the great majority of profoundly and severely mentally retarded persons are simply incapable of making decisions as to whether it is in their best interest to be placed in an M.R.R.T.C. or not. Particularly where a committee is appointed to represent them and that committee is a person such as Maxine Pulliam who has no personal relationship with her mentally retarded ward, there is a compelling reason to find that the commitment of such wards is not a voluntary one. See *Halderman, supra*, at pp. 96–97.

While the Legislature, in tracking as it did in K.R.S. Chapter 202B a great part of the language of Chapter 202A, may have addressed the problem of involuntary commitment in a manner which could suggest commitment only by court order, the use of the words "involuntary commitment" is ambiguous enough in the context of the mentally retarded to allow the Court to place the interpretation it does on this statute.

The question of whether or not mentally retarded persons who are placed in Outwood by their guardians who are their parents or close relatives are involuntarily committed within the meaning of K.R.S. 202B.040 is a close one. From a practical point of view, those mentally retarded persons who are represented by guardians in the great majority will have no more meaningful contribution to make in the decision to place them in Outwood than do the mentally retarded who are represented by a committee. However, as suggested in *Parham v. J. L. and J. R., Minors, etc.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), although commitment of a mentally ill child represents a significant deprivation of his liberty, it is also to be presumed that the parent who places him in a mental institution is acting in his best welfare. That holding however does not transform the commitment by a guardian of a mentally retarded person from a voluntary to an involuntary commitment.

 We are strengthened in our belief that such commitments are involuntary by the language of K.R.S. 202B.060(9) which gives residents who are minors the right to seek relief from actions approved by their parents or guardians for or against admission and discharge. While that statute did not give adult mentally retarded persons the specific right to seek such relief, it at least convinces this Court that the Legislature was aware that minors might, in fact, be involuntarily committed, either by their parents or guardians, and therefore gave them the right to seek relief either as to admission or discharge.

Summing up, we are of the opinion that all of the persons who are confined at Outwood or who will be confined at the new Outwood, with the exception of those very few who have in fact made their own applications to be admitted, are entitled to the least restrictive alternative mode of treatment. Those few who are truly voluntary residents are not entitled to the least restrictive alternative mode of treatment but are entitled to release upon their own request.

█ Having set out the rights of the mentally retarded, we turn now to the remedies. First, it is noted that 13% of the now confined persons at Outwood are moderately or mildly retarded. The great weight of the opinion is to the effect that such persons can reasonably survive in an environment outside a M.R.R.T.C. Defendants have, in fact, indicated that such persons will not be confined at the new Outwood except for brief periods of respite care not to exceed 30 days. The Court holds as to those persons which it has defined as being involuntarily committed, and who are moderately or mildly retarded, that no right exists in Excepticon or the State defendants to hold such people in a M.R.R.T.C. The defendants must make a reasonable effort to see to it that these residents are placed in an environment outside the institution as soon as they are assured that the arrangements made for these persons are safe and will result in their continued habilitation.

Also to be observed is the fact that defendants have already determined that certain residents at Outwood are entitled to be placed in community living arrangements, but that decision cannot be executed because there are no adequate community living arrangements available. In this connection, defendants point to the fact that K.R.S. Chapter 210, and more particularly 210.370 through 210.480 grants the right to cities and counties to join in providing regional mental health programs which include rehabilitative services for patients suffering from mental retardation. See 210.410(6). The Secretary of Human Resources is authorized to make grants to assist these regional mental health programs not to exceed 50% of certain expenditures, but no grants are to be made for capital expenditures. See 210.420.

Although the State has been slow in providing funds with which new beds may be made available for the mentally retarded in communities as opposed to institutions, it is apparent that steps are being taken to remedy the situation; 125 new beds were provided in 1979.

■ The remedy, it seems to the Court, as to those persons who are found by the interdisciplinary team to be capable of placement outside of Outwood or other M.R.R.T.C. is first to make certain these persons' needs for outside placement are communicated to the Department of Human Resources. Secondly, it appears to the Court that where Excepticon has informed the Secretary of Human Resources of the need for outside placement of a resident, then the Secretary should give priority to that resident as against the application of other mentally retarded persons who are in the community to be admitted to such facilities.

Finally, in construing K.R.S. Chapter 202B, the Court does not accept the contention of the plaintiffs that every profoundly and severely mentally retarded person is entitled to be placed in a community living facility. While this holding is implicit in the Court's previous holding that K.R.S. Chapter 202B is concerned with the rights of residents who are confined in M.R.R.T.C., the Court need only observe the least restrictive alternative modes of treatment for some profoundly and severely retarded persons may, indeed, be a M.R.R.T.C. Further, the Court observes that whether or not to place a person in such a facility and whether or not to continue his placement there is contingent upon the particular facts and circumstances surrounding that individual and his progress, and should be left to a decision-maker such as the interdisciplinary team rather than in the hands of a court or court-appointed official. See the dissenting opinion of Chief Judge Seitz in *Halderman, supra,* at pp. 91–92 and by way of analogy the language of the Supreme Court in *Parham v. J. L. and J. R., Minors, etc., supra,* bearing on the question of admission of mentally ill juveniles.

While our analysis of K.R.S. Chapter 202B does do away with the need for a lengthy constitutional analysis, it is necessary to point out that K.R.S. 202B.060(9) would, if read in isolation, constitute a denial of equal protection to those residents who are not minors to seek relief from the actions approved by their committees or guardians for or against admission and discharge. However, we believe that in the light of the analysis which we have given K.R.S. Chapter 202B, there is no need to declare any portion of the statute unconstitutional, and that the rights of persons other than minors who are residents will be protected to the same extent as those of minors, with the exception of the truly voluntarily committed who have the right, as noted before, of securing their own discharge.

Two brief observations should be made. The first is that several courts have held that persons confined in an institution have a right to be free from physical abuse by employees or fellow confinees. There may also be a constitutional right to be free from serious injuries caused by assaults by fellow inmates where the injuries came about as a result of the failure of the defendants to exercise ordinary care to prevent such injuries. *Halderman, supra,* 446 F.Supp. at p. 1320; *Holt v. Sarver,* 300 F.Supp. 825 (E.D.Ark.1969); *Holt v. Sarver,* 309 F.Supp. 362 (1970). We find no such violation on the facts before us.

■ We observe that Excepticon's argument that it is not subject to suit under 42 U.S.C. Sec. 1983 is without merit. Where a private corporation undertakes to perform duties which have been largely within the province of the State, and wherein it receives substantial sums of money from the State for the performance of such duties, there exists a sufficient relationship between it and the State to make it a suable entity under 42 U.S.C. Sec. 1983. See *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Title 42 U.S.C. Sec. 1988 provides in substance for the award of reasonable attorneys' fees to parties who have prevailed in actions brought under 42 U.S.C. Sec. 1983, et seq. Since the parties may wish to brief the question of whether or not plaintiffs' attorneys are entitled to fees in this case, and if so the amount thereof, the Court will grant plaintiffs 20 days hereinafter to brief this question and submit any affidavits per-

taining to the time spent by them on the case, with the right of the defendants to respond within 20 days hereinafter.

A judgment in accordance with these findings of fact, conclusions of law and memorandum opinion will be entered this day.