R.A.J., et al. Plaintiffs,

v.

**Gary E. MILLER, M.D., et al. Defendants,**

and

**United States of America Amicus Curiae.**

Civ. A. No. 3–74–0394–H.

United States District Court, N.D. Texas, Dallas Division.

April 2, 1984.

Roger L. Gette, North Central Texas Legal Services, Inc., Dallas, Tex., Laura Smith, Texas Legal Services Center, Austin, Tex., for plaintiffs.

W. Kent Johnson, Texas Dept. of Mental Health & Mental Retardation, Austin, Tex., Philip Durst, Asst. Atty. Gen., Educ. and Civil Rights, Austin Div., Austin, Tex., for defendants.

Helen Brattin, David Van Os, Schwartz, Waterman, Fickman & Van Os, Houston, Tex., for Tex. Employee Union Comm. Workers of America.

Andrew J. Barrick, Gleam O. Davis, U.S. Dept. of Justice, Civil Rights Division, Washington, D.C., for U.S., amicus curiae.

David Pharis, Martha Boston, Dr. James Peden, R.A.J. Review Panel, Austin, Tex., for R.A.J. Review Panel Members.

## MEMORANDUM OPINION AND ORDER

SANDERS, District Judge.

Plaintiffs in this case represent the patients at eight state mental hospitals (Austin, Big Spring, Kerrville, San Antonio, Rusk, Terrell, Vernon, and Wichita Falls); Defendants are the representatives of the Texas Department of Mental Health and Mental Retardation ("TDMHMR"); the United States is amicus curiae. The R.A.J. Review Panel, established by this Court on April 22, 1982, pursuant to the Settlement Agreement ("the Agreement") filed March 2, 1981 (approved by the Court on April 3, 1981), filed its Third Report ("the Report") to the Court on December 1, 1983. The Report states that Defendants are not complying with the Settlement Agreement in several significant areas. The Court held an evidentiary hearing on the Panel's allegations on February 3, 1984.

▇ The Court finds that Defendants have failed to comply, or have insufficiently complied, with several major provisions of the Agreement. The areas of noncompliance include:

1. Failure to adequately plan and document individualized treatment;

2. Failure to adequately protect patients from harm; and

3. Failure to provide sufficient staff to ensure minimally adequate patient care.

### Background

This litigation, in progress for nearly ten years, began with the filing of the Complaint in April 1974. The case was transferred to this Court in 1979. On March 2, 1981, the parties and the United States entered into a Settlement Agreement which provided for the creation of an independent Review Panel ("the Panel") whose primary function is to monitor compliance with the Settlement. (Agreement, p. 6.) The Panel,

established by Charter on April 22, 1982, is composed of three members selected by unanimous agreement of the parties.

The Charter empowers the Panel to approve implementation plans and proposed modifications to the Rules of the Commissioner. (Charter, p. 4.) By creating the Panel, the parties and the United States intended to minimize the need for the Court's participation in the supervision of the Agreement and plans of implementation; provision was made in the Agreement, however, for bringing any compliance matter to the attention of the Court, as the Panel has now done in its Third Report. (Agreement, p. 8.) The Report alleges noncompliance in four broad areas of concern: (1) Individualized Treatment; (2) Protection from Harm; (3) Adequate Staffing; and (4) Placement of the Mentally Retarded Population. The Court will address each of these areas seriatim.

### Individualized Treatment

The sections of the Agreement that are pertinent to this issue provide as follows:

V. *Patient Rights*

1. All patients shall have the right to individualized treatment planning by qualified and competent mental health professionals.... *Each Treatment Plan shall fully describe the patient's diagnosis, specific problems and specific needs. It shall also contain a description of the short and long-term treatment goals, and a projected timetable for their attainment....* The individualized Treatment Plan shall be a part of the patient's permanent medical record and shall be reviewed and modified on a regular basis.

2. *Patients have the right to have sufficient staff available to provide adequate individualized treatment planning and programming....* Specifically, the defendants shall provide adequate staff support *to make available to all patients* an average of thirty (30) hours per week of appropriate planned or scheduled activities related to the patient's Treatment Plan and the Unit Treatment Program. However, this provision shall not apply to:

a. Geriatric and other patients who, as fully documented in the patient's record, are medically or psychiatrically unable to participate in the thirty (30) hours of planned activities; ....

15. Patients shall be entitled to be treated and addressed in a dignified manner.

VI. E. *Programming for Geriatric and Patients in the General Population.*

1. Defendants shall take appropriate action to provide geriatric and general population patients with *meaningful, professionally recognized, psychological and recreational programming* .... Within ninety days of the entry of this Settlement Agreement a plan shall be developed for patient programming which sets forth scheduled activities for each unit described in terms of duration, frequency, objectives and staff responsibility....

(Agreement, pp. 10, 11, 14, 24 (emphasis added).)

Defendants' plan for implementing the requirements of V(1) & (2) above has been accepted by the Panel on the condition that the standards therein be measured by the Problem-Oriented Record System ("PORS") on a case-by-case basis. (Report, p. 11.) Although the Department utilizes the PORS, the hospitals generally fail to use the system correctly; that is, client problems are not being defined by treatment staff in a way that allows specific treatment interventions to be identified and utilized. In a review of 217 patient records the Panel noted a failure by staff to clearly state problems as required by the use of the PORS. The Panel further noted a generalized failure to differentiate skills, strengths and weaknesses of patients in understandable language that is useful to all mental health staff. (Report, p. 12;

Transcript of Hearing ("Tr."), pp. 9, 10–11, 38, 49, 50, 55, 59, 65–66.)

Specifically, the Panel reported:

The Review Panel has become increasingly concerned about the effectiveness of the treatment which patients are receiving. In the previous two Reports to the Court, the Panel has expressed concern about the lack of individualization of problem descriptions, the broadness of a problem description, and the formulaic approach to treatment strategies.... [T]he Review Panel has concluded that for the most part, patient records do not reflect thoughtful problem identifications followed by thoughtful intervention programs.... In most units, every patient has the same set of interventions prescribed, regardless of the nature of the problem described.... Far too often, the interventions do not appear to logically relate to the problem....

(Report, pp. 16–17.) Defendants' witness Tracy R. Gordy acknowledged that a recent survey of Austin State Hospital by the National Institute of Mental Health noted serious deficiencies with respect to treatment planning. (Tr., pp. 149–50.) The Panel also expressed concern about the number of hours spent in primarily recreational, as opposed to therapeutic activities, (Report, p. 18), and the frequency with which programming is aimed at the lowest level of functioning. (*Id.*, pp. 18–19.) Thus, although the hospitals are making strides toward satisfying the thirty-hour requirement, the Panel has serious reservations about the relevance and meaning of much of the scheduled programming. After considering the guidelines set forth in the Agreement and in the Defendants' implementation plan, as well as those adopted by the Joint Committee on Accreditation of Hospitals ("JCAH") and the National Institute of Mental Health ("NIMH"), the Panel was of the view that Defendants are not in compliance with Sections V(1) & (2) of the Agreement. (Report, p. 12.)

Defendants dispute this conclusion. Dr. Miller, Commissioner of the Texas Department of Mental Health and Mental Retardation ("TDMHMR") agreed that, in principle, treatment should be based on a patient's individual problems. (Tr., p. 75.) He and Dr. Gordy both felt that the Department record-keeping procedures were generally adequate in this regard; use of shorthand diagnostic language, in their view, adequately alerts staff members to the problems and treatments required by each patient. Messrs. Miller and Gordy say that Patient records, therefore, are sufficiently individualized. (Tr., pp. 76, 136–40.) Dr. Miller went on to testify, however, that for many patients there is no rationale for choosing specific interventions to specific treatment problems. (Tr., p. 86.) Dr. Miller believes that the administration of neurolyptic medication is the only effective treatment for schizophrenia (Tr., p. 81); in his view, the use of lithium carbonate is of similar importance in the treatment of affective disorders. (Tr., p. 88.) For patients with these disorders, he suggests, all forms of psycho-social therapy are indistinguishable and, in any case, of limited utility. In his view, the same result is achieved no matter what the nature of the treatment or the number of staff participating. (Tr., p. 82.)

In essence, Dr. Miller's testimony, as well as the other testimony offered by Defendants on this issue, (*see* testimony of Tracy Gordy, M.D., and Defendants' Exhibits 12–15), reflects a rejection of the scientific basis for individualized treatment planning and programming. The Court expresses no opinion on the relative merits of the various philosophical approaches to the treatment of mental disorders. It is important to note, however, that Dr. Miller's testimony specifically addressed only the treatment of schizophrenia and certain affective disorders, which account for less than one-half of the client population of the hospitals. (Tr., p. 148.) In any case, this litigation is now in the enforcement stage. The terms of the Settlement Agreement, not the opinions of the parties, control. The Agreement, freely entered into by Defendants and judicially enforceable, provides that patients have the right to individualized treatment planning, including full

descriptions of the patients' specific problems and specific needs. (Agreement, Section V(1).) The Agreement further requires that Defendants provide patients with meaningful, professionally recognized, psychological *and* recreational programming. (*Id.*, Section VI(E) (emphasis added).)

All three semi-annual reports submitted by the Panel to this Court have expressed dissatisfaction with Defendants' compliance with the individualized treatment requirement of the Agreement. (*See* First Report, filed November 30, 1982, pp. 5–8; Second Report, filed May 12, 1983, pp. 15–19; Third Report, filed December 1, 1983, pp. 16–20.) The Court agrees with the Panel's opinion that "the individualization of treatment planning and programming is at the heart of the program requirements of the Settlement Agreement." (Second Report, p. 12.) Defendants' disagreement with the wisdom of this requirement, which they accepted in 1981, is no excuse for noncompliance.

It is clear, and the Court concludes, that Defendants are *not* complying with these provisions of the Settlement Agreement. Specifically, the Court finds as follows:

1. Defendants have failed to correctly utilize the Problem Oriented Records System; problem statements are often meaningless and do not facilitate the identification of specific treatment interventions.

2. Interventions are often not clearly aimed at addressing the problem statement, nor are they sufficiently geared to the individual patient.

3. A recent survey of Austin State Hospital by the National Institute of Mental Health also noted serious deficiencies with respect to treatment planning. (Tr., p. 59.)

4. Defendants' reliance on the point/level system in most general psychiatric units fails to provide suitable treatment and programming for patients who function at higher levels, and frequently discourages progress in those who function at lower levels. In some units, moreover, patients who refuse to participate in this method of programming are denied suitable alternative programming. (Tr., pp. 14–16.)

Finally, before turning to the next area of concern, the Court will address the interpretation of the thirty-hour programming requirement contained in Section V(2) of the Agreement. Although not all of the hospitals are complying with this requirement, the Panel feels that they are attempting to do so. Defendants offered testimony, however, suggesting that aggregate averages on a hospital or state-wide basis would satisfy the thirty-hour requirement. (Tr., p. 161.) The Court is of the opinion that this is an unreasonable interpretation of the Agreement. Section V(2) specifically states that an average of thirty hours of programming per week must be made available to *all* patients except those who are medically or psychiatrically unable to participate. Generalized exceptions exist for geriatric patients, medical-surgical wards, and transitional living units. Without documentation in the patient's record by appropriate and qualified professionals of the need for individual exceptions, however, Defendants may not refuse to comply with this provision of the Agreement.

### Protection From Harm

The following sections of the Agreement are pertinent to this issue:

V. 2. (reprinted above)

. . . .

16. Patients shall be entitled to reside in facilities which are environmentally clean and safe. . . .

After having received several complaints of incidents of violence in the State Hospitals, the Panel conducted an investigation. (Tr., pp. 20–21.) The investigation focused upon the type of violence, the staff response to the situation, and the extent to which violent behavior had been addressed in the patient's individual treatment plan. The review included only acts of patient violence, such as hitting, fighting, breaking windows, and the like. During the period August 1 through September 15, 1983, 102 of 278 patients whose records were re-

viewed by the Panel were violent according to descriptive incidents set forth in their records. (Report, p. 24; Tr., pp. 20–22.) Violence was identified as a problem, however, in the treatment plans for only 60% of these patients. (Tr., p. 22.) Many of the instances of patient violence noted by the Panel were indeed severe, including one recent instance in which a patient's eyes were gouged out by another patient. (Tr., p. 40.) Other indicia of harm, not all of which are related to violent acts, is demonstrated by records reflecting staff and patient injuries. On average throughout TDMHMR hospitals there are approximately 800 patient injuries per month and approximately 300 staff injuries. (Tr., pp. 25, 159, 186.)

In the opinion of witnesses for Defendant TDMHMR, the Panel unfairly equates patient injury with patient violence and does not offer any standards for determining whether violence and injury are excessive in Texas state hospitals. (Tr., pp. 100–03, 185.) One of Defendants' witnesses also minimized the importance of some of the reported violent behavior by noting that the incidents were only "acting out" behavior. (Tr., pp. 144–46.) This criticism, however, fails to recognize that "acting out" behavior may escalate to serious injury. Moreover, because the Panel disregarded "acting out" behavior that did not result in documented aggressive violent acts or injury, its report may actually underestimate the amount of threatening behavior and violence in the hospitals.

The Panel's survey was limited and did not refine available data to the extent demanded by Defendants; the results, therefore, may indeed be inflated. Nevertheless, based upon their review of the literature and their professional experience, the Panel members unanimously concluded that patient violence and injury are excessive in the hospitals and can be significantly reduced. (Tr., pp. 41–42, 56–58, 66–68.) Certainly, violent behavior by mental patients is neither unknown nor unexpected; for this very reason, however, the hospitals must be prepared to deal with violent incidents and reduce injuries to a minimum.

The Panel found very little evidence, however, that the hospitals are adequately responding to these incidents or adopting strategies designed to minimize their frequency and severity. (Report, p. 26.)

Within general psychiatric units, the responses to violent behavior are primarily reactive, such as injections of medications, seclusion of the violent patients, and the training of staff in restraint and escape holds. Moreover, on these units behavior was only infrequently addressed as a problem in the patients' treatment plans; by contrast, in programs with a strong behavior modification format, treatment plans more often contained strategies for eliminating violent or aggressive tendencies. (Report, pp. 24–25.) The Panel concluded that:

> [T]he records at all the eight hospitals reflect little evidence of the staff's trying to understand and address what had caused or provoked the violent behavior.... The fact that this attention to the dynamics and meaning of behavior is lacking in the general psychiatric units is unacceptable to the Review Panel.

Report, p. 26.

In the Court's opinion, the deficiencies in Defendants' responses to violent behavior are related to their failure to comply with the individualized treatment requirements of the Agreement. Defendants have a responsibility under Sections V(1), (2) and (16) to adequately assess and treat violent behavior. Efforts must also be made, through the development of treatment strategies, to prevent or minimize the necessity for administering psychotropic medications to control violent behavior once it has erupted. (Agreement, Section VI(B)(1).) Because of the excessive number of incidents of violence as well as Defendants' failure to adequately prepare for and respond to these incidents, the Court finds that Defendants are not in compliance with Sections V(2) and V(16) of the Settlement Agreement.

### Adequate Staffing

The following sections of the Agreement are pertinent to this issue:

V. 2. (reprinted above)

.    .    .    .    .

16. (reprinted above)

Panel member James K. Peden, M.D., testified that, since violence is more likely to occur in an unstructured environment, the development of meaningful programming and strategies of treatment can lead to a reduction in the frequency of violent episodes. (Tr., pp. 65–67.) He recognized, however, that this cannot be accomplished without adequate staffing. (Tr., p. 66.) Although Defendant TDMHMR has requested funds for adequate staffing, the number of staff authorized by the Legislature is insufficient to meet even the minimum requirements of the Settlement.

Data compiled by the Panel on patient-to-staff ratios reveal severe deficiencies. On the 11:00 P.M. to 7:00 A.M. shift, the ratios vary from a low of approximately 7:1 (that is, 7 patients to 1 staff) at Kerrville State Hospital to a high of 20:1 at San Antonio State Hospital. (Report, p. 64.) In addition, reports of ward coverage by only one mental health worker are not uncommon. (Report, p. 69.) A Panel survey disclosed that in August 1983, 77 of 124 wards had shifts which were staffed by only one person. (Tr., p. 28.) In the Panel's professional judgment, absolute minimum ratios for the maintenance of a safe environment are 5:1 between the hours of 7:00 A.M. and 11:00 P.M. and 10:1 between 11:00 P.M. and 7:00 A.M. (Report, p. 29.) In order to achieve these ratios, the number of mental health workers would have to be increased by 1,198. If the number of mental health workers in the hospitals is not increased, 1,121 patients, or 44% of the hospitals' patient population as of August 1983, would have to be released in order to achieve the minimum ratios. (Tr., p. 61.).

As the source of the 5:1/10:1 ratios, the Panel cites standards developed by Defendant TDMHMR's mental health division in connection with its budget requests. Although Defendants denied the existence of any such standards, (Tr., pp. 172–73), they in fact recognized the urgent need for increased staffing by requesting 824 additional positions from the 1983 Legislature. (Tr., p. 179.)

The Court adopts the recommendation of the Panel with respect to necessary staff. Defendants have not come forward with their own preferred ratios for General Psychiatric Units ("GPU's"), but the ratios developed by them for the Multiple Disabilities Units ("MDU's") closely approximate the ratios suggested by the Panel for GPU's. Defendants' Implementation Plan for MDU's calls for a 4:1 patient-to-worker ratio between 7:00 A.M. and 11:00 P.M., and a 8:1 ratio for 11:00 P.M. to 7:00 A.M. Goal Statement for Multiple Disabilities Units, 4(A)(13). In any event, the Court finds that current ratios are not acceptable. It is clear from the evidence that inadequate staffing levels contribute to deficiencies in individualized treatment and protection from harm. The result is noncompliance with the Settlement Agreement. Finally, reported instances of zero and single-worker ward coverage are totally unacceptable. Single staffing provides additional opportunity for unchecked violent behavior, places staff at risk, and denies patients adequate protection from harm from themselves or others. Single staff person coverage of a ward is dangerous and under no circumstances should a staff member be on duty alone. (Tr., pp. 26, 28–29, 66–67.)

### Placement of the Mentally Retarded Population

The following sections of the Agreement are pertinent to the discussion of this issue:

VI. D. *Mentally Retarded Patients*

1. No person who is determined to be mentally retarded ... shall be admitted to any psychiatric facility except in accordance with the *Rules of the Commissioner* ... and unless the following factors are present in order to justify admission:

a. Indication of dangerousness to self or others of sufficient magnitude as to indicate an inability to function in a non-institutional psychiatric setting;

b. Need for planned psychiatric, medical, social, or psychological evaluation and treatment, special drug therapy, treatment requiring hospitalization, or continuous skilled observation which is not available in a facility whose primary mission is care and training of retarded individuals.

2. No mentally retarded person, ... admitted to a psychiatric hospital pursuant to paragraph 1 above, shall remain in the hospital for a period of time longer than that necessary to alleviate the condition which necessitated the patient's admission to the State Hospital ....

3. Mentally retarded persons who are residents in State Hospitals and can benefit from less restrictive alternatives shall be placed in State Schools or Community Intermediate Facilities in accordance with the *Rules of the Commissioner* ....

....

7. Within ninety days from the date of the entry of this Settlement Agreement the defendants shall submit a Plan of Implementation for placement of mentally retarded persons currently in State Hospitals who no longer have psychiatric diagnosis. Such clients will be placed in facilities for the mentally retarded in the least restrictive setting appropriate to their needs. All such clients shall be placed in an appropriate facility or discharged within one year from the submission of the Plan of Implementation. This plan will also provide for implementing the timetable within which persons referred to in paragraphs 1 and 2 above shall be placed in appropriate facilities for the mentally retarded or shall be discharged.

8. *After September 1, 1981,* in the event a mentally retarded patient is committed to a State Hospital under the Mental Health Code and a Treatment Team determines that such commitment is inappropriate because the patient is not mentally ill, the hospital shall, *not later than forty-five days* after this diagnostic determination has been made, *secure an appropriate non-psychiatric placement* in the least restrictive setting *or discharge the patient.*

9. *After September 1, 1981,* when a Treatment Team determines that a mentally retarded patient ... is no longer in need of State Hospital care ... the hospital shall, *not later than forty-five days* after this diagnostic determination has been made, *secure an appropriate non-psychiatric placement ... or discharge the patient.*

Section VI(D) has been difficult to implement. (Tr., p. 204.) The Panel and the Court are aware of the sensitive political, social, and moral dilemmas attendant to the proper placement of mentally retarded persons inappropriately committed to psychiatric hospitals. Ninety mentally retarded persons identified by TDMHMR staff in May 1981 as inappropriate for hospitalization at state mental hospitals still remain in these facilities. Additional mentally retarded persons have been improperly and perhaps illegally committed to State mental hospitals since the entry of the Settlement Agreement. These persons are not mentally ill and/or do not require hospitalization. One hundred sixty-seven (167) mentally retarded persons improperly remain in mental hospitals, and as of March 1983 had not received their required evaluations, placements or discharges. Pursuant to the requirements of Sections VI(D)(7-9) of the Agreement, *none* of these persons should now remain in state hospitals. (Tr., pp. 45-46.)

Notwithstanding compliance by TDMHMR with Section VI(D)(10) of the Settlement Agreement (notifying State court judges to cease the practice of improper commitment of mentally retarded persons to state hospitals), improper commitments by these judges continue. During the last six months sixty-five inappropriately committed persons were removed from State hospitals; at the same time another sixty-five inappropriately committed persons took their places. Similarly,

based upon a survey by TDMHMR personnel, 14 of 22 mentally retarded persons committed to Terrell State Hospital in October 1983 were inappropriately committed because they were not mentally ill.

Because State court judges are unable to commit mentally retarded persons to State schools unless bed space is available, mentally retarded persons continue to be improperly committed to State hospitals, notwithstanding purported statutory safeguards which are intended to prevent improper commitments. The Mental Health Division must initially accept persons so committed as there is no "space available" statutory limitation preventing these persons from being committed to mental hospitals. Moreover, a mental health commitment is presumptively valid on its face; therefore, the Division is required to accept the committed person even if it is obvious that the individual is not mentally ill. Pursuant to the Agreement, once the individual is identified as inappropriate for mental hospital care, TDMHMR is required to place or discharge the improperly committed individual. (Tr., pp. 54, 184, 204–06.)

Although the continuing actions of State court judges continue to frustrate implementation of the Settlement, the ultimate responsibility for relieving the problem of ever-increasing improperly committed persons rests with Defendants.

The deadlines established in the Agreement for implementation of Section VI(D) have not been met, but the parties have continued their efforts to establish modified time tables. At the August 1983 meeting, attended by all parties and the Court, the Defendants presented their proposed implementation plan and policy statement. The proposal provided that joint discharge planning meetings for all unsuitably hospitalized mentally retarded persons were to be completed by January 1, 1984, with appropriate placements occurring within 45 days of said meetings. In mid-December, however, the Panel learned that these deadlines had also not been met. (Plaintiffs' Exhibits 9 and 10). Defendants apparently were engaged in further re-drafting of the

policy, but had failed to inform the Panel of the proposed changes. (Tr., p. 32.) As a result, the Panel concluded that Defendants were not in compliance with the applicable portions of the Agreement. Defendants testified that the final version of their policy would be disseminated by February 22, 1984. (Tr., p. 198.) Attached to Defendants' proposed Findings of Fact and Conclusions of Law, filed March 2, 1984, is a document dated February 23, 1984, entitled "Administrative Policy, Procedures for Discharge of Persons with Mental Retardation from State Mental Hospitals". Assuming the Panel has received a copy of this document and agrees with its substantive provisions, Defendants have now corrected their noncompliance with the requirements of Section VI(D) of the Agreement.

The Court expects that, from this date forward, Defendants will communicate any further problems in the implementation of Section VI(D) to the Panel as such problems occur.

### Remedy

Having found that Defendants are not complying with several portions of the Agreement, the Court must determine an appropriate remedy. The Court reserves this determination pending the receipt of recommendations from the Plaintiffs, Defendant TDMHMR, the United States, and the Panel.

Without limiting or foreclosing any appropriate suggestions which the parties may advance, the Court notes the following options available to it:

1. Appointment of a Special Master to oversee and direct Defendants' efforts to achieve compliance with the Court's decree;

2. Discharging some patients from the hospitals to resolve the inadequacies in patient-staff ratios;

3. Requiring compliance by a date certain, with express penalties for failure to comply.

The Court is aware of the serious implications posed by some of the foregoing.

Nevertheless, the Court is obligated to enforce its judgment. That is especially true in this case where commitments, voluntarily made by Defendants in the Settlement Agreement, are not being honored.

■ A federal court possesses a broad range of equitable powers available to enforce and effectuate its orders and judgments. *See, e.g., Gates v. Collier,* 616 F.2d 1268 (5th Cir.1980), *reh'g denied en banc,* 641 F.2d 403 (5th Cir.1981); *New York State Association for Retarded Children v. Carey,* 596 F.2d 27 (2d Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); *United States v. City of Detroit,* 476 F.Supp. 512 (E.D.Mich.1979). *See also, Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1971), *supplemented at* 344 F.Supp. 387 (M.D.Ala.1972).

Plaintiffs, Defendant, the United States, and the Panel are directed to file by **noon, April 20, 1984,** recommendations as to what actions the Court should take to obtain compliance with the Settlement Agreement.

**SO ORDERED.**